**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| ROBERT R. BENNIE, JR., individually, and on behalf of BOB BENNIE WEALTH MANAGEMENT, INC. <br><br> Plaintiff, <br><br> v. <br><br> JOHN MUNN, in his official and individual capacity, JACK E. HERSTEIN, in his official and individual capacity, RODNEY R. GRIESS, in his official and individual capacity, and JACKIE L. WALTER, in her official and individual capacity. <br><br> Defendants. | Case No.  4:11-cv-03089 |

# PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

Steve Grasz (#19050)
David M. Newman (#24549)
HUSCH BLACKWELL LLP
1620 Dodge Street, Suite 2100
Omaha, NE  68102
Telephone:  (402) 964-5000
Facsimile:  (402) 964-5050
steve.grasz@huschblackwell.com
dave.newman@huschblackwell.com

*Attorneys for Plaintiff*

OMA-330833-4

# TABLE OF CONTENTS

TABLE OF AUTHORITIES...........................................................................................iii

INTRODUCTION........................................................................................................ 1

STANDARD OF REVIEW ........................................................................................... 1

ARGUMENT............................................................................................................... 1

I.  THE AMENDED COMPLAINT ALLEGES SUFFICIENT FACTS AS TO
    EACH DEFENDANT TO STATE CLAIMS UNDER 42 U.S.C. § 1983 .................... 1

    A.  The Allegations Set Forth In The Amended Complaint Provide A
        Sufficient Factual  Basis To Show Plausible § 1983 Claims As To Each
        Defendant And The Allegations Show The Personal Involvement Of
        Each Defendant In The Deprivation Of Bennie's Constitutional Rights
        As To Each Claim ................................................................................. 2

        1.  The Amended Complaint alleges specific facts showing
            Defendant Herstein's personal involvement in violating Bennie's
            constitutional rights under the Due Process Clause, Equal
            Protection Clause and the First Amendment........................................... 4

        2.  The Amended Complaint alleges specific facts showing
            Defendant Walter's personal involvement in violating Bennie's
            constitutional rights under the Due Process Clause, Equal
            Protection Clause and the First Amendment......................................... 22

        3.  The Amended Complaint alleges specific facts showing
            Defendant Munn's personal involvement in violating Bennie's
            constitutional rights prior to and in addition to his issuance of the
            Orders ................................................................................................ 27

        4.  The Amended Complaint alleges specific facts showing
            Defendant Griess' personal involvement in violating Bennie's
            constitutional rights with regard to issuance of the Orders.................... 41

    B.  The Amended Complaint Must Be Read As A Whole And The
        Sufficiency Of The Factual Allegations Must Be Assessed In The
        Entirety Of The Pleading ............................................................... 62

II.  BENNIE HAS A PROTECTED PROPERTY INTEREST IN HIS
     REGISTRATION UNDER NEBRASKA LAW ....................................................... 64

    A.  The Nebraska Securities Act Creates A Protected Property Interest In
        Bennie's Broker-Dealer Agent And Investment Adviser Representative
        Registrations Due To The Statutory Provisions For Automatic Approval
        Of Applications For Registration, The Statutory Requirements
        Accompanying Any Postponement Of Approval Of A Registration, And
        The Statutory Findings Required In Order To Deny Registration ................. 65

1.   The cases relied upon by the Defendants are clearly distinguishable from the case at hand due to the distinct differences between the underlying regulations and statutes ................ 67

2.   Defendants' citation to outdated Nebraska case law does not bear any consideration in the resolution of the case at hand ........................ 70

B.   The Director Is Not Empowered To Impair An Applicant's Registration Through Postponement, Suspension, Or Revocation Of That Registration Without Adherence To The Securities Act's Due Process Requirements .................................................................................. 71

1.   Defendants' reliance on § 8-1103(4)(d) is misplaced and ignores other obligatory provisions within the Securities Act as well as the impact such a reading of the statute would have on registration .......... 72

2.   Defendants' concession that the conditions on Bennie's registration were meant to give them additional time to examine allegations against Bennie demonstrates their attempt to evade Bennie's due process rights and to arbitrarily deny him the full enjoyment of his property rights ........................................................ 74

C.   The Defendants' Issuance And Participation In The Issuance Of The Stigmatizing Orders Damaged Bennie's Professional Reputation And Stripped Him Of Rights Previously Held As A Registered Broker-Agent And Investment Adviser  Representative ....................................................... 77

D.   The Defendants' Actions Unreasonably Interfered With And Effectively Destroyed Bennie's Right to Pursue His Chosen Profession During the Period at Issue ......................................................................................... 80

III.   BENNIE HAD NO ABILITY TO DEMAND A HEARING ON THE  ORDERS, AND HE EXHAUSTED ALL REMEDIES AVAILABLE TO HIM ............................. 81

IV.   BOB BENNIE WEALTH MANAGEMENT SUFFERED DAMAGES DUE TO THE ACTIONS OF THE DEFENDANTS ................................................................ 84

CONCLUSION ...................................................................................................... 85

CERTIFICATE OF SERVICE ..................................................................................... 86

# TABLE OF AUTHORITIES

**Federal Cases**

*Andrews v. Fowler,*
98 F.3d 1069 (8th Cir. 1996)......................................................................... 63

*Ashcroft v. Iqbal,*
556 U.S. 662, 129 S.Ct. 1937 (2009) ...................................................... 1, 64

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544, 127 S.Ct. 1955 (2007) ............................................................. 2

*Clemmons v. Armontrout,*
477 F.3d 962 (8th Cir. 2007)..................................................................... 2, 3

*Easter House v. Felder,*
910 F.2d 1387 (7th Cir. 1990)................................................................. 63, 66

*Ellis v. Norris,*
179 F.3d 1078 (8th Cir. 1999)........................................................................ 2

*Entergy Arkansas, Inc. v. Nebraska,*
161 F.Supp.2d 1001 (D.Neb. 2001)........................................................ 67, 68

*Green v. DeCamp,*
612 F.2d 368 (8th Cir. 1980)........................................................................ 78

*Habhab v. Hon,*
536 F.3d 963 (8th Cir. 2008)........................................................................ 80

*Littlefield v. City of Afton,*
785 F.2d 596 (8th Cir. 2000)........................................................................ 65

*Lustgraaf v. Behrens,*
619 F.3d 867 (8th Cir. 2010)......................................................................... 1

*Mangan v. Cullen,*
870 F.2d 1396 (8th Cir. 1989)...................................................................... 79

*Marler v. Missouri State Board of Optometry,*
102 F.3d 1453 (8th Cir. 1996)...................................................................... 84

*McGee v. Hester,*
724 F.2d 89 (8th Cir. 1983).................................................................... 62, 63

*Movers Warehouse, Inc. v. City of Little Canada,*
71 F.3d 716 (8th Cir. 1995).......................................................................... 65

*National Council of Resistance of Iran v. Department of State*,
251 F.3d 192 (D.C. Cir. 2001) ................................................................... 77

*Paul v. Davis*,
424 U.S. 693, 96 S.Ct. 1155 (1976) ......................................................... 78

*Robbins v. Oklahoma*,
519 F.3d 1242 (10th Cir. 2008) .................................................................. 3

*Stauch v. City of Columbia Heights*,
212 F.3d 425 (8th Cir. 2000) ............................................................... 65, 66

*Tilson v. Forrest City Police Dep't*,
28 F.3d 802 (8th Cir. 1994) ...................................................................... 63

*VanHorn v. Neb. State Racing Comm.*,
304 F.Supp.2d 1151 (D. Neb. 2004) ............................................... 65, 69, 80

*Wisconsin v.Constantineau*,
400 U.S. 433, 91 S.Ct. 507 (1971) .................................................. 77, 78, 79

**State Cases**

*Bosselman, Inc. v. Nebraska and Neb. Liquor Control Comm'n*,
230 Neb. 471, 432 N.W.2d 226 (1988) ......................................... 65,  66, 70

*Central Park Pharm. v. Nebraska Liquor Control Comm'n.*,
216 Neb. 676, 344 N.W.2d 918 (1984) ...................................................... 82

*JCB Enterprises, Inc. v. Nebraska Liquor Control Comm'n*,
275 Neb. 797, 749 N.W.2d 873 (2008) ...................................................... 74

*Murray v. Neth*,
279 Neb. 947, 783 N.W.2d 424 (2010) ................................................. 70, 71

*Stoneman v. United Nebraska Bank*,
254 Neb. 477, 577 N.W.2d 271 (1998) ...................................................... 82

**Federal Statutes**

42 U.S.C. § 1983 ................................................................................... 1, 2

**State Statutes**

Neb. Rev. Stat. §§ 8-1101 to 8-1124 ......................................................... 28

Neb. Rev. Stat. § 8-1101 et seq. ............................................................... 28

Neb. Rev. Stat. § 8-1103(1) ........................................................ 3, 15, 35, 55

Neb. Rev. Stat. § 8-1103(3) ..................................................................... 66

Neb. Rev. Stat. § 8-1103(4)(a) .................................................. 16, 36, 56, 66, 69

Neb. Rev. Stat. § 8-1103(4)(d) .................................................. 69, 72, 73, 74

Neb. Rev. Stat. § 8-1103(9) ....................................................................passim

Neb. Rev. Stat. § 8-1108.01(4) ............................................................... 73

Neb. Rev. Stat. § 8-1119 ........................................................................... 81

Neb. Rev. Stat. § 8-1120 ............................................................................. 5

Neb. Rev. Stat. § 84-901(3) ...................................................................... 81

Neb. Rev. Stat. § 84-915 ........................................................................... 82

Neb. Rev. Stat. § 84-917 ..................................................................... 81, 82

**Federal Rules**

Fed. R. Civ. P. 12(b)(6) ............................................................................. 64

**Other Authorities**

294 NAC § 10.005.01 ................................................................................ 69

49 N.A.C. § 3.003.03C .............................................................................. 83

49 N.A.C. § 5.003.02 .......................................................................... 81, 83

49 N.A.C. § 5.003.03A ............................................................................. 83

## INTRODUCTION

On September 1, 2011, Plaintiff Robert R. Bennie (hereafter "Bennie") filed an Amended Complaint against Defendants Munn, Herstein, Griess and Walter.   The Amended Complaint sets forth claims against the Defendants under 42 U.S.C § 1983 for violation of Mr. Bennie's rights under the Due Process Clause, the Equal Protection Clause, and the First Amendment. The Defendants filed a Motion to Dismiss the Amended Complaint under Rule 12(b)(6), and the Plaintiff now submits this brief in opposition to the Motion.

## STANDARD OF REVIEW

In reviewing a motion to dismiss, the Court should accept as true all factual allegations contained in the Amended Complaint and grant all reasonable inferences in favor of the Plaintiff.   *Lustgraaf v. Behrens*, 619 F.3d 867, 873 (8th Cir. 2010).   The Amended Complaint must contain sufficient factual matter that a claim to relief is plausible on its face.  *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009).  "A claim is plausible on its face if the complaint contains sufficient facts for a court to draw an inference that the defendant is liable for the alleged misconduct."  *Id.*

## ARGUMENT

### I.    THE AMENDED COMPLAINT ALLEGES SUFFICIENT FACTS AS TO EACH DEFENDANT TO STATE CLAIMS UNDER 42 U.S.C. § 1983.

The Defendants' motion challenges whether the Amended Complaint sets forth sufficient facts as to the individual involvement of each Defendant with regard to certain claims under 42 U.S.C. § 1983.   As shown below in detail, the Amended Complaint, with its thirty-some pages of detailed allegations, is more than sufficient to state a claim as to each Defendant for each Section 1983 claim. As is clear from a review of the

allegations in the Amended Complaint, not all Defendants participated equally or in the same capacity as to each and every action giving rise to the claims.  It is also true, however, that the Amended Complaint alleges a coordinated scheme of harassment by the Defendants wherein each contributed to the violation of Mr. Bennie's constitutional rights.  Where a complaint alleges a scheme among several defendants, the U.S. Supreme Court has stated that "a naked assertion of conspiracy. . . gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of entitlement to relief."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557, 127 S.Ct. 1955, 1966 (2007).  Given the highly developed factual allegations contained in the Amended Complaint regarding each of the Defendants' individual participation in the misconduct that resulted in violations of Bennie's constitutional rights, there can be no question that it satisfies the plausibility standard required of a complaint under the federal rules.

> **A.** **The Allegations Set Forth In The Amended Complaint Provide A Sufficient Factual Basis To Show Plausible § 1983 Claims As To Each Defendant And The Allegations Show The Personal Involvement Of Each Defendant In The Deprivation Of Bennie's Constitutional Rights As To Each Claim**.

The legal principles set forth in the cases cited by the Defendants demonstrate that the Amended Complaint more than satisfies the plausibility pleading standard for each of the § 1983 claims.  It is well established that in stating a claim under 42 U.S.C. § 1983 a plaintiff cannot rely only on allegations against collective defendants, but needs to allege facts demonstrating each defendant's individual participation in the acts that lead to constitutional violations.  *See Ellis v. Norris*, 179 F.3d 1078, 1078 (8th Cir. 1999)(stating that a plaintiff needs to allege "facts supporting any individual defendant's personal involvement in the [constitutional] violations.");  *Clemmons v. Armontrout*, 477

F.3d 962, 967 (8th Cir. 2007); *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008) (dismissing § 1983 claims where the plaintiff used nothing more than "the collective term 'Defendants' or a list of the defendants named individually but with no distinction as to what acts are attributable to whom . . . ."). When reviewing the highly factual and individualized allegations of the Amended Complaint, it is clear that Bennie has alleged and provided sufficient facts showing that each of the Defendants were involved in, and significantly participated in, the actions that lead to and constituted each alleged constitutional violation. These allegations distinguish--with considerable detail for an initial pleading--which actions are attributable to whom.

The allegations in the Amended Complaint, bolstered by details set forth from the Defendants' own records, permit the Court to reasonably infer that the Defendants used their authority as state regulators to harass Bennie due to the exercise of his First Amendment rights, interfere with his business as a registered broker-dealer agent and investment adviser representative because of his exercise of his First Amendment rights, subject him to disparate treatment and to deny him due process. The Defendants used their authority as state regulators to interfere with Bennie's relationship with his broker-dealer/investment adviser, LPL Financial ("LPL"), even though that relationship was essential to Bennie's livelihood. *See* Neb. Rev. Stat. § 8-1103(1) (stating "registration of an agent shall not be effective unless the agent is employed by a broker-dealer. . ."). Furthermore, the Amended Complaint provides factual detail as to how each individual participated in the actions that violated Bennie's constitutional rights.

1.   **The Amended Complaint alleges specific facts showing Defendant Herstein's personal involvement in violating Bennie's constitutional rights under the Due Process Clause, Equal Protection Clause and the First Amendment.**

The Defendants' brief alleges the Amended Complaint fails to include facts showing Defendant Herstein's personal involvement in constitutional violations against Mr. Bennie.  The Amended Complaint, however, goes far above and beyond the level of factual content in its allegations against Herstein required under the federal rules and the plausibility standard for notice pleading in order to state each § 1983 claim.

The Defendants also argue that since Herstein was not the individual who signed the Orders which effectively suspended Bennie's ability to operate his investment business, he cannot be liable for any damages which resulted from their issuance. The Defendants' reasoning is flawed for several reasons. First of all, the Amended Complaint states claims against Herstein based on violations of different constitutional rights - not different categories of activity (i.e. investigations vs. Orders). The Defendants cannot re-write the Amended Complaint according to categories of their own making and then declare it deficient. Several actions on the part of Herstein, like the other Defendants, relate to each constitutional violation and, therefore, each Section 1983 claim.  The issuance of the Orders, for example, implicates and impacts all three of the Section 1983 claims, not just the Due Process Claim. Finally, the act of placing a signature on the Orders (by Defendant Munn) is not the only act that led to their development, drafting, content or issuance or the denial of Due Process to Bennie. Defendant Herstein, as shown below, was personally involved in evading the normal hearing process.

The following facts, along with the reasonable inferences therefrom as described below, are contained in the allegations against Herstein in the Amended Complaint.  All paragraph references are to the Amended Complaint.

1.      Mr. Herstein is the Assistant Director of the Bureau of Securities (the "Bureau") for the State of Nebraska.  Mr. Herstein was appointed by the Director as the Assistant Director of the Bureau of Securities within the Department pursuant to Neb. Rev. Stat. § 8-1120 and empowered with the Director's delegated powers and duties under the Act.  His duties and responsibilities include applying the Department's regulations to agents and investment adviser representatives, and the training and supervision of the officers and securities examiners of the Bureau.  (¶ 8)

2.      In the fall of 2009 Mr. Bennie aired a television commercial in which he promoted Second Amendment rights and offered to contribute $100 towards the purchase of a firearm for new clients. After Bennie's television ad appeared, the Defendants, including Herstein, embarked on a concerted scheme of harassment aimed at Mr. Bennie because of his political views as described below.  (¶¶ 27-29)

3.      The day after a news article appeared detailing Bennie's Tea Party involvement Herstein personally joined and participated in a conference with Mr. Bennie's broker-dealer - an entity under Herstein's regulatory authority - to complain about Mr. Bennie's "gun slingin ads" and his political statements criticizing President Obama.  (¶¶ 30, 52-54)

4.      Herstein's scheme of harassment included subjecting Mr. Bennie to an unrelenting string of five (5) separate investigations within a four (4) month period related to his public political statements or advertising.  (¶ 31)

5.     When Mr. Bennie and/or his broker-dealer would address one inquiry from Herstein and other Department officials, Herstein and his fellow Defendants would immediately launch another inquiry.  (¶ 32)

6.     Herstein proposed and discussed issuing official orders imposing large fines on Mr. Bennie before the inquiries into Bennie's public communications were even addressed by Mr. Bennie's broker-dealer and before the facts were known. (¶¶ 33, 49)

7.     In November 2009, an unknown securities analyst at the Department obtained an old DVD containing a short, professionally produced presentation distributed by Mr. Bennie to select clients, and reviewed it for regulatory compliance. In light of factual allegation 1, above, it is reasonable to assume this person was under the supervision of Herstein. (¶ 34)

8.     The DVD presentation explains a service available to Mr. Bennie's clients called "eMoney," which is not an investment product or a sales promotion item.  eMoney is computer software that allows Mr. Bennie's customers to organize and access their account balances and other key documents electronically.  In light of factual allegation 1, above, it is reasonable to assume Herstein was and is responsible for distinguishing between electronic document organizing software and securities services as well as for applying securities regulations appropriately. (¶ 35)

9.     The DVD was well over two (2) years old at the time it was reviewed. In light of factual allegation 1, above, it is reasonable to assume this review was under the supervision of Herstein and he had a duty to determine the age, use and current status of the DVD.  (¶ 36)

10.     Whereas the DVD pertains to a computer software service to organize and access documents, it is not clear whether any securities disclosure was needed.

Nevertheless, after a series of discussions and e-mails over a month-long period with Defendant Griess, LPL consented to Mr. Griess' demand to add an additional disclosure, and they e-mailed him a response indicating such.  (¶ 38)

11.    On or about December 17, 2009, Defendant Griess forwarded LPL's e-mail message confirming their agreement to add additional disclosure to Mr. Herstein, who wrote in reply, "Bob [Bennie] is always seen wearing a cowboy hat lately, so I say 'Hang Him High'."   (¶ 39)

12.    Mr. Herstein's "Hang Him High" comment is a direct reference to Mr. Bennie's television advertisements offering to contribute $100 towards the purchase of a firearm for new clients.  Mr. Bennie owns horses, and was shown riding a horse and wearing a "cowboy" hat in the television advertisement which aired from August 18, 2009 until December 27, 2009.  (¶¶ 26-28, 40)

13.    Only one day after receiving LPL's initial e-mail response, wherein LPL stated it would follow up with him regarding the eMoney DVD, Mr. Griess sent an e-mail to Ms. Sheila Cahill ("Ms. Cahill"), Legal Counsel for the Department, stating, "Just wanted to recap on the orders I spoke of at the [Department] meeting."  "2. Bob Bennie – Jack [Herstein] has suggested 25K per violation of which we have 2. Failing to disclose IA [investment adviser] business on the CD featuring Bennie and the "Do business with me and I'll put forth $100 towards the purchase of a firearm for you" (I suspect this one didn't get [LPL] Compliance approval, but it's just a guess at this point.)  I'm currently corresponding with LPL Compliance and will keep you posted." (¶ 49)

14.    Mr. Herstein and Mr. Griess were proposing fines against Mr. Bennie before completion of any investigation and without a legitimate basis. They were openly

discussing at a Bureau meeting, issuing an official order imposing a fine on Mr. Bennie of $25,000.00 for the television advertisement while admitting that they had not even verified whether the advertisement had been pre-approved.  (¶ 50)

15.    On February 2, 2010, Mr. Griess sent an e-mail to Ms. Cahill stating, "I've scheduled a conference call with LPL concerning Bob Bennie and his recent string of activities; i.e. lack of IA disclosure, gun slingin ads, and calling Obama a 'communist' and an 'evil' man issues. . . . Would like to have you present if you can make it.  Jack's [Mr. Herstein] coming too." (¶ 58)  Since the e-mail states Mr. Herstein was planning on participating in the conference with LPL it is a reasonable inference he knew the purpose and agreed to participate in the discussion with a regulated broker-dealer about Mr. Bennie's "gun slingin ads" and his political statements regarding President Obama. In fact, on the same date, Griess sent an e-mail to LPL stating "Our asst. Director, Jack Herstein . . . [has] asked to participate  . . . ."

16.    On February 2, 2010, Ms. Cahill responded to Mr. Griess' e-mail stating, "Count me in.  I think we probably need to have a brief discussion prior to the call about the concerns being raised and the way in which we will raise those concerns.  The last thing we want is a Journal Star headline reading something like 'State interferes with Bennie's free speech.' In addition, we need to be mindful of potential political ramifications – given the party affiliation of Bennie and the current administration."  The e-mail from the Bureau's legal counsel reasonably indicates Herstein's participation in the pre-conference discussion about the "political ramifications – given the party affiliation of Mr. Bennie." (¶ 59)

17.     Although Herstein was well aware of the implications of his actions with regard to Mr. Bennie's First Amendment rights, he decided to disregard those rights. (¶ 60)

18.     Herstein, along with Griess, used his regulatory position and power to schedule a conference call with a regulated entity to complain about Mr. Bennie's statements criticizing President Obama, while privately noting they must be careful due to the party affiliation of Bennie and the Governor.  (¶ 61)

19.     On February 3, 2010, an LPL representative responded to the request for a conference call stating that he would be joined on the call by LPL's Associate Counsel, Mr. Ken Juster.  (¶ 62)

20.     According to handwritten notes dated February 4, 2010, and maintained in the Department's files, LPL had informed the participants in the meeting, including Herstein, that both Mr. Bennie's television advertisement and the eMoney DVD had been approved by LPL's advertising compliance section prior to their use.  (¶ 65)

21.     Also prior to the conference call with LPL, Ms. Cahill sent Mr. Griess an e-mail asking, "Did LPL ever send the copy of the approved script for Bennie's gun ad?" (¶ 67)  In light of factual allegation 1, above, it is a reasonable inference this request was made under the supervision of Herstein. It is also a reasonable inference he was aware of the request since he was a participant in the meeting for which the documentation was requested.

22.     On February 8, 2010, prior to the scheduled conference call between Mr. Griess, Mr. Herstein, Ms. Cahill, and LPL officials, Mr. Griess e-mailed LPL stating, "we have yet to receive the requested documents in preparation for today's call."  The

documents requested pertained to Mr. Bennie's "gun" advertisement and the *Lincoln Journal Star's* article on Bennie's Tea Party activities.  (¶ 66)

23.    In response to Mr. Griess' request for documentation regarding approval by LPL of the television advertisement and Bennie's statements in the Tea Party article, LPL wrote, "I have attached the paperwork associated with the review of the TV commercial.  The newspaper article was not submitted for review."  (¶ 68)

24.    The attached documentation submitted by LPL showed that the television advertisement had been reviewed by LPL's advertising compliance analyst and one version of the advertisement was "approved with changes/comments" on September 7, 2009, and another version had been "approved as is" on September 11, 2009.  (¶ 69)

25.    Upon his receipt of the documentation from LPL on February 8, 2010, Mr. Griess forwarded those documents on to Mr. Herstein and Ms. Cahill in an e-mail stating, "This just in…".  (¶ 70)  It can be reasonably inferred from this factual allegation and other related factual allegations that Herstein was being informed of every detail of the inquiry into Bennie's public communications.

26.    Handwritten notes from the conference call between LPL and Herstein, et al. indicate discussion of the fact a reporter from the *Lincoln Journal Star* had approached Mr. Bennie to conduct the interview that resulted in the news article on Bennie's Tea Party activities that was being investigated by Herstein and the other Defendants.  The notes also show that LPL was instructed by the participants in the conference (which included Herstein) to discuss concerns that they had regarding the "gun" ad with Bennie.  The conference participants were also informed that other LPL registered agents had a similar practice of offering gift cards and certificates.  Finally, the notes show that as a result of the pressure from the participants in the conference

(which included Herstein), LPL agreed that Mr. Bennie would be reassigned to a Senior Analyst for closer supervision of his public communications.   (¶ 71)

27.    Additional handwritten notes contained in the Department's files from the conference call summarize the call, including: that LPL had approved Mr. Bennie's DVD presentation; that the LJS Tea Party article was not submitted to LPL prior to publication for review, but that LPL would pay additional attention and talk with Mr. Bennie about the LJS article; that "B[ob] B[ennie] received call from Don Walton to ask for interview (as one of Tea Party, strong Republican),"; that LPL was of the view the interview was not related to Mr. Bennie's or LPL's business; that LPL informed the participants in the conference that other registered agents provided customers with gift certificates for doing business with the registered agent, but that LPL was unsure if any others contained specific references to firearms; that, at the participants'(which included Herstein) request, LPL would provide the number of gift cards for guns Mr. Bennie had given out; that LPL had talked with Mr. Bennie the week prior and expressed concerns about the advertisement due to Defendants' inquiries; that Mr. Bennie had agreed to take the advertisement off the air; that the participants (which included Herstein) questioned LPL on what were its policies and guidelines regarding registered agents expressing their political views; that LPL responded that it did not have any policies or guidelines on registered agents expression of their political views; and, that as a result of the call from their regulators, LPL would reassign Mr. Bennie to an LPL senior analyst for closer supervision.   (¶ 72)

28.    In an e-mail labeled "follow up to items requested on 2.8.10," (which was the conference in which Herstein participated) LPL wrote to Mr. Griess, "See questions and answers below regarding the items we discussed on Monday."  In the content of the

e-mail, LPL replied that Mr. Bennie had discontinued the television advertisement on December 27th because he had "found it to be ineffective," and that Mr. Bennie had distributed one (1) gift card related to that advertisement.   Additionally, LPL communicated that it "does not have any specific guidelines that focus on communicating political views to the public."  (¶ 73)

29.   In February 2010, Mr. Herstein's boss, Mr. Munn, received through the mail a copy of a "one-on-one" dinner invitation from Mr. Bennie related to his investment business.  (¶ 74)

30.   Rather than simply discarding the invitation, Mr. Munn forwarded the invitation on to Mr. Griess and asked for him to review it. Soon thereafter, Mr. Griess contacted Mr. Bennie regarding the dinner invitation, and Mr. Bennie informed Mr. Griess that the invitation had been pre-approved by both the Financial Industry Regulatory Authority ("FINRA") and LPL's advertising compliance department.  (¶ 75) In light of factual allegation 1, above, it is reasonable to infer this inquiry was made under the supervision of Herstein.

31.   On February 18, 2010, Mr. Griess sent an e-mail to Mr. Bennie's broker dealer, LPL, regarding "yet another public communication from Bob Bennie," and attached the dinner invitation to the message.  In the body of the e-mail, Mr. Griess wrote, "As you know, we've recently discussed other communication from Mr. Bennie and pursuant to those discussions, LPL indicated that Mr. Bennie was to be assigned to a 'Senior Analyst' to review/approve communications prior to their release.   The assignment appears to be unsuccessful as this communication is non-compliant." Mr. Griess went on to state, "The Department requests that LPL provide the following information on the Senior Analyst assigned to and responsible for the review/approval of

Mr. Bennie's communications with the public."  Also in the e-mail, Mr. Griess demanded, in large, bold type that all "scheduled/accepted 'one-on-one' dinner meetings are to be cancelled immediately."   Mr. Griess concluded the e-mail by threatening regulatory action against LPL: "The Department [headed by Munn and Herstein] is expressly concerned, not only with the persistent, multiple, repeated acts of non-compliance, but with the continued failure of LPL to act in an appropriate manner to remedy the issues. The Department [headed by Munn and Herstein] may invoke whatever administrative action deemed necessary and appropriate under its authority against both Mr. Bennie and/or LPL Financial to insure compliance."  (¶ 77) These allegations are of additional relevance to Herstein as discussed below.

32.     In the February 18, 2010 e-mail, Mr. Griess expressly threatened LPL with administrative action by the Department [headed by Munn and Herstein] if it did not take punitive action against Mr. Bennie for publications and advertising that Mr. Griess characterized as non-compliant, but had actually been pre-approved by FINRA and/or the LPL compliance department or which were protected First Amendment speech. (¶ 78)   In light of factual allegation 1, above, and factual allegation 33, below, it is reasonable to infer this threat was made under the supervision of Herstein.   This inference is shown to be accurate by an e-mail from Herstein.

33.     Later on February 18, 2010, Mr. Herstein sent an e-mail to Mr. Griess commenting on Mr. Griess' earlier threat against LPL stating, "Excellent e-mail Rod." (¶ 79)

34.     Minutes later, Mr. Griess responded to Herstein, "Thank-you kindly. Hopefully they'll get the message loud and clear that the Department is just about to the 'end of its rope' with the crap. If not, $$$$$$$$."  (¶ 80)  The reasonable inference from

these facts is that Herstein joined in the stated assertions and was agreeable with imposing large fines on Bennie related to his "gun" ad, and his criticisms of President Obama.

35.    On March 2, 2010, Mr. Griess launched yet another salvo at Bennie and LPL and sent an e-mail to LPL stating, "please find the attached Sun Life Financial Seminar recently received by our Assistant Director of Securities . . . . It's a classic example.  The invitation contains no mention of LPL in this case, but honestly, what are the chances of a potential client attending this seminar, doing business from an insurance perspective only? . . . . Yet from this invitation, the potential client doesn't have a clue of Mr. Bennie's other associations.  One would think, especially from a sales prospective, that Mr. Bennie would want to inform the potential client of his many financial related facets and how they all tie together.  Why not disclose up front."  (¶ 88)

36.    On March 9, 2010, LPL responded to Mr. Griess' Sun Life Insurance Seminar e-mail stating, "Rod, this invitation was approved on 1/29/10 by LPL Financial. The reviewer did not require Mr. Bennie to add broker dealer disclosure as she erroneously believed he was distributing invitation on approved letterhead that contained broker dealer disclosure.  We agree that LPL disclosure should have been included with invitation.  We reviewed the matter with Mr. Bennie and confirmed that he will disclose his affiliation with LPL at the seminar.  We also reviewed this oversight with Mr. Bennie's assigned reviewer."  (¶ 89)

37.    That same day, Griess forwarded this e-mail to Mr. Herstein.  (¶ 90)

38.    The next day, March 10, 2010, Mr. Herstein replied to Mr. Griess in an e-mail stating, "Was this the new 'expert reviewer'?  My response to their response would

be 'that's it.'  We should keep this in a reserve file and move on and hopefully he [Mr. Bennie] will eventually hang himself along with LPL."  (¶ 91)

39.    On or about October 4, 2010 another LJS article entitled "Tea Party: Reduce State Spending," was placed in the Department's files related to Mr. Bennie. (¶ 93)  In light of factual allegations above, it is a reasonable inference this was done under the supervision of Herstein.

40.    On November 2, 2010, LPL abruptly terminated its relationship with Mr. Bennie.  Upon information and belief, LPL's action was related to the continued pressure and harassment from Herstein and the other defendants related to Mr. Bennie. (¶ 94)

41.    Upon separation from LPL, Mr. Bennie performed due diligence on several other broker-dealers and promptly associated with Prospera Financial ("Prospera") effective November 23, 2010.  (¶ 95)  As required by Neb. Rev. Stat. §§ 8-1103(1), (2)(d), Mr. Bennie notified the Department (and therefore the Securities Bureau of which Herstein is the head) of the transfer of his association from LPL to Prospera by filing a U-4 form through the CRD at FINRA.  (¶ 96)

42.    On or about December 2, 2010 (a full month after abruptly terminating its relationship with Mr. Bennie) LPL made a U-5 filing with Herstein's Securities Bureau in which it claimed the termination was due to violation of internal firm policies and procedures related to client signatures.  (¶ 97)

43.    Immediately following LPL's termination of its broker-dealer relationship, Mr. Bennie retained, at his own expense, a qualified expert third party to perform an independent audit of his entire firm.  After reviewing all of Mr. Bennie's files, the auditor

verified Mr. Bennie had not acted improperly or in violation of LPL policies and procedures during his association with LPL.  (¶ 98)

44.     On December 3, 2010, Prospera wrote a letter to Mr. Herstein stating, "While we have not received any request for additional information, we believe you are reviewing Mr. Bennie's file because of the disclosures on his U4.  In order to expedite your review, Mr. Bennie has supplied the enclosed notarized statement concerning the disclosure issues.  We believe this information will help you in your decision process and permit you to enter his registration as 'Approved'." In the attachment to the letter, Prospera and Mr. Bennie provided the results of the independent audit that revealed he had not violated any LPL policies that they claimed formed the basis for his termination. (¶ 99)

45.     On December 7, 2010, Mr. Griess e-mailed Mr. Herstein informing him that Prospera had contacted Griess "to see if [the Department] needed anything further to assist in expediting the registration."  Mr. Griess went on to write, "I mentioned to [Prospera] that we were merely in the preliminary stages of this and due to the severity of the reported disclosure, particularly the discharge termination from LPL, the Department in all likelihood may be inclined to perform an unannounced audit of Mr. Bennie's office."  Thereafter, Mr. Griess quoted Neb. Rev. Stat. § 8-1103(4)(a): "If no denial order is in effect and no *proceeding* is pending under subsection (9) of this section registration shall become effective at noon of the thirtieth day after an application is filed. . . ." (emphasis in the original)  Mr. Griess next wrote to Herstein, "May have to check with legal, but proceeding may imply formal hearing, not simply a request for more information, examination or inquiry."  (¶ 100)

46.     In response to Mr. Griess' warning about the statute, Mr. Herstein wrote back, "I don't see why this would be treated any different than any other applicant applying for a license."  (¶ 101)

47.     Also in the December 7, 2010, e-mail Mr. Griess informed Mr. Herstein that the Department had received a "plea for assistance/expedition dated December 3, 2010" from Prospera.  (¶ 102)

48.     On December 17, 2010, without any contact with Mr. Bennie and without any type of notice or opportunity for a hearing, the Department summarily issued an order (the "December Order") signed by Mr. Munn that suspended Mr. Bennie's ability to operate his thirteen-year-old investment business by placing the following conditions on Mr. Bennie: (1) all securities and advisory activities of Bennie shall be solely limited to existing customers of Bennie, who transfer their accounts to Prospera from LPL; (2) Bennie shall not advertise or solicit new clients; (3) Bennie will not act as a principal or in any compliance or supervisory capacity regarding the securities activities of other agents of Prospera; (4) Bennie will timely comply fully with all requests for information from the Department.  A true and correct copy of the December Order was attached as Exhibit A.  (¶ 104)  In light of factual allegation 1, above, it is a reasonable inference this order was drafted and issued under the direct supervision of Herstein and quite possibly by Herstein himself.

49.     The December Order made findings as to Mr. Bennie's ability to serve and solicit any and all new clients without providing Mr. Bennie any form of notice of the allegations or factual support for the so-called findings or an opportunity for a hearing at which Mr. Bennie could challenge those allegations.  (¶ 105)  In light of factual

allegation 1, above, it is a reasonable inference this order was drafted and issued under the direct supervision of Herstein.

50.     The Defendants, including Herstein, did not even contact Mr. Bennie subsequent to their surprise December Order until January 18, 2011, when they contacted his new broker-dealer, Prospera.  (¶ 106)

51.     As 60 percent to 70 percent of the revenues for Mr. Bennie's business are generated from new clients and new business, the December Order made his business economically unsustainable, and the Order severely restricted Mr. Bennie's ability to operate his business in his chosen profession and thereby earn a livelihood.  (¶ 107)

52.     Additionally, in light of the federal statutory requirements and corresponding limitations on state law, the Orders were a suspension of Mr. Bennie's registration.  (¶ 108)

53.     In addition to completely cutting off the ability to serve or even solicit new or additional clients and the vast majority of his income, the December Order prevented Mr. Bennie from registering as an agent and investment adviser representative in a number of other states, as well as cutting off his business with several major insurance companies.  (¶ 109)  In light of factual allegation 1, above, it is a reasonable inference Herstein was well aware of the impact the order would have on Bennie.

54.     Herstein knew, or should have known, that the December Order would have a detrimental effect on Mr. Bennie's registration in other states given the reporting requirements of FINRA and the CRD, which is used by all, or nearly all, of the state securities regulators as well as the Securities and Exchange Commission through FINRA.  Additionally, the December Order was distributed publically via a website under Herstein's control.  (¶ 110)

55.     Herstein's actions through the December Order effectively destroyed the value and utility of Mr. Bennie's registration and business as it instantly eliminated the source of the vast majority of his income, as well as causing existing clients to transfer their accounts, thereby making his business economically unsustainable.  (¶ 111)

56.     After the surprise December Order, Mr. Bennie made complaints to the Governor's Office, the Nebraska Attorney General, Mr. Herstein and the Department's legal counsel about the denial of notice and a hearing.  In response, an Amended Order was issued on February 17, 2011 (the "February Order").  Again without a hearing, the Amended Order maintained significant portions of the suspension including the prohibitions on advertising, soliciting of new clients and acting as a principal or in any compliance or supervisory capacity for other agents. A true and correct copy of the February Order was attached as Exhibit B.  (¶ 113)  In light of factual allegations above, it is a reasonable inference this order was drafted and issued under the direct supervision of Herstein.

57.     Although Bennie's broker-dealer had requested an expedited review of the U5 filing in early December of 2010, it was not until March 9, 2011 that an on-site records inspection was conducted at Mr. Bennie's offices.  (¶¶ 99, 115)  In light of factual allegations above, it is a reasonable inference this financially devastating delay was approved by Herstein.

58.     After the audit of Mr. Bennie's records, the Defendants, including Herstein, found no basis for the suspension of Mr. Bennie's registration.  (¶ 115)

59.     Finally, after three months of Mr. Bennie of being suspended from servicing any new clients or soliciting any new business, and five (5) days after their audit of Mr. Bennie's office, an order was issued on March 14, 2011 (the "March Order")

4:11-cv-03089-RGK -CRZ   Doc # 33   Filed: 10/21/11   Page 26 of 92 - Page ID # 194

fully approving Mr. Bennie's registration as an agent and investment adviser representative.  A true and correct copy of the March Order was attached as Exhibit C. (¶ 116)  In light of factual allegations above, it is a reasonable inference this order was drafted and issued under the direct supervision of Herstein.

60.    Nowhere in the March Order did the Department acknowledge that it had determined Mr. Bennie had not acted improperly, or directly address the suspensions contained in or the implications of the December and February Orders.  (¶ 117)

61.    Despite finding no basis for the suspension of Mr. Bennie's registration during its on-site inspection or otherwise from December 2010 to March 14, 2011, the Defendants persisted with harassing inquiries and numerous demands for records and information regarding Mr. Bennie. These inquiries were wholly unrelated to the initial allegation by LPL, and persisted through April of 2011- more than a month after the lifting of the suspension of Mr. Bennie's registration.  (¶ 118)  In light of factual allegations above, it is a reasonable inference this activity persisted under the direct supervision of the head of the Securities Bureau, Mr. Herstein.

62.    This harassment included multiple e-mails from Ms. Walter to Mr. Bennie's new broker-dealer, Prospera, requiring Prospera (a regulated entity) to respond to numerous "questions" and "inquiries."  (¶ 119)

63.    Additionally, Mr. Herstein required Prospera to transmit all of Mr. Bennie's account balances to the Department on a weekly basis.  (¶ 120)

64.    Ms. Walker demanded that Prospera provide her detailed documentation proving Mr. Bennie had not opened any new accounts since the December Order, in an effort to catch Mr. Bennie in a technical violation of the December Order.  (¶ 121)  In

OMA-330833-4                                            20

light of factual allegations above, it is a reasonable inference this demand was made under the direct supervision of Herstein.

65.    Upon issuance, and up until May 13, 2011, both the December and February Orders were published on the Department's public internet website, and upon information and belief, remain available by request to the public.  After repeated verbal and written requests by Mr. Bennie, the Defendants finally took down the December and February Orders from the Department's web site on May 13, 2011.  This web site is under the direct control of Herstein.  (¶ 122)

66.    At no point during the relevant period of time did Defendants, including the head of the Securities Bureau, Mr. Herstein, afford Mr. Bennie any form of notice or an opportunity to be heard.  (¶ 123)

67.    After fifteen-plus years of running a highly successful investment business, the timing of the Defendants' (including Herstein) actions and harassing inquiries was not coincidental.  The Defendants' actions and inquiries were politically motivated and they colored the Defendants' unprecedented later actions and orders, including their denial of Mr. Bennie's due process rights, as described above.  (¶ 125)

68.    The Defendants, including Herstein, utilized their power as government officials to treat Mr. Bennie differently than other similarly situated individuals who publicly advertise their investment services and who have been required to notify the Department of their association with a new broker-dealer.  (¶ 142)

69.    The Defendants, including Herstein, knew of Mr. Bennie's political views and leadership in the Tea Party movement prior to his notifying the Department of his association with Prospera.   The Defendants' repeated baseless inquiries into

Mr. Bennie's television ads, mailings, and registration demonstrate that the Defendants singled Mr. Bennie out for intentional harassment and discrimination.  (¶ 143)

70.    The content and nature of the December and February Orders caused to be issued by the Defendants against Mr. Bennie are unprecedented and unlike the treatment afforded to any prior similarly situated registrant or applicant.  (¶ 144)

71.    The Defendants, including Herstein, utilized their power as government officials to impose penalties and to take other punitive actions against Mr. Bennie due to his political views and public statements on matters of public concern in violation of his First Amendment rights.  (¶ 152)

72.    Defendants' actions in issuing their Orders, conducting their multiple inquiries in a harassing manner, and pressuring Mr. Bennie's broker-dealer to take punitive actions on their behalf, was intentional and motivated in whole or part by Mr. Bennie's political speech and political views.  (¶¶ 146, 155)

      **2.**    **The Amended Complaint alleges specific facts showing Defendant Walter's personal involvement in violating Bennie's constitutional rights under the Due Process Clause, Equal Protection Clause and the First Amendment.**

The Defendants' brief alleges the Amended Complaint fails to allege facts showing Defendant Walter's personal involvement in constitutional violations against Mr. Bennie.  A review of the Amended Complaint, however, shows that it goes above and beyond the required level of factual content in its allegations against Walter under the federal rules and the plausibility standard for notice pleading to state each § 1983 claim.  The Defendants also argue that since Walter was not the individual who signed the Orders, she cannot be liable for any damages which resulted from their issuance.  The Defendants' reasoning is flawed for several reasons. First of all, the Amended

Complaint states claims against Walter based on violations of different constitutional rights - not different categories of activity (i.e. investigations vs. Orders). The Defendants cannot re-write the Amended Complaint according to categories of their own making and then claim it is deficient. Several actions on the part of Walter, like the other Defendants, relate to each constitutional violation and, therefore, each Section 1983 claim.  The issuance of the Orders, for example, implicates and impacts all three of the Section 1983 claims, not just the Due Process Claim. Finally, the act of placing a signature on the Orders (by Defendant Munn) is not the only act that led to their development, drafting, content or issuance or the denial of Due Process to Bennie.

The following facts, and the reasonable inferences therefrom as described below, are contained in the allegations against Walter in the Amended Complaint:

1.     In the fall of 2009 Mr. Bennie aired a television commercial in which he promoted Second Amendment rights and offered to contribute $100 towards the purchase of a firearm for new clients.   After Bennie's television ad appeared, the Defendants, including Walter, embarked on a concerted scheme of harassment aimed at Mr. Bennie because of his political views as described below.  (¶¶ 27-29)

2.     Ms. Walter is a securities examiner with the Securities Bureau. Ms. Walter is charged with investment adviser and broker-dealer examinations including reviewing registrations and applications for registration, and the conduct by registered entities and persons to ensure compliance with the Act and state regulations promulgated by the Department in accordance with the Act.  (¶ 10)

3.     The Defendants' (including Ms. Walter) scheme included subjecting Mr. Bennie to an unrelenting string of five (5) separate investigations within a four (4) month period related to his public political statements or advertising. (¶ 31)

4.      When Mr. Bennie and/or his broker-dealer would address one inquiry from the Defendants, they would immediately launch another inquiry.  Ms. Walter personally participated in this activity as described below.  (¶ 32)

5.      The Defendants discussed and proposed issuing official orders imposing large fines on Mr. Bennie before the facts were even known and before the inquiries were even addressed by Mr. Bennie's broker-dealer.  (¶¶ 33, 49)  Given her position and duties, as set forth in factual allegation 2, above, it is reasonable to infer that Ms. Walter was personally involved in these inquiries and proposed orders.

6.      In November 2009, an unknown securities analyst at the Department obtained an old DVD containing a short, professionally produced presentation distributed by Mr. Bennie to select clients, and reviewed it for regulatory compliance. (¶ 34) Given her position and duties, as set forth in factual allegation 2, above, it is reasonable to infer that Ms. Walter was either the analyst in question or was personally involved in the review of the DVD.

7.      On January 15, 2010, Mr. Griess sent an e-mail to Mrs. Walter stating, "[A]s it stands right now I'm planning on hitting Mr. Bennie up for about $50K (2 ad violations @ $25K/ea.)  We'll see where it goes."  (¶ 51)  It is reasonable to infer from this factual allegation that Ms. Walter was personally involved in the scheme aimed at Mr. Bennie and was fully aware of what was taking place.

8.      Although Mr. Griess had indicated, on December 7, 2010, the likelihood of a Department audit of Mr. Bennie's office, it was not until March 9, 2011 that the Defendants, including Ms. Walter, finally conducted an on-site records inspection at Mr. Bennie's offices.  (¶¶ 99, 115)   During the delay, Bennie suffered catastrophic

losses. After the audit of Mr. Bennie's records, the Defendants found no basis for the suspension of Mr. Bennie's registration.  (¶¶ 115, 156)

9.      Despite finding no basis for the suspension of Mr. Bennie's registration during its on-site inspection, or otherwise, from December 2010 to March 14, 2011, the Defendants, including Ms. Walter, persisted with harassing inquiries and numerous demands for records and information regarding Mr. Bennie. These inquiries were wholly unrelated to the initial allegations supposedly being investigated, and persisted through April of 2011- more than a month after the lifting of the suspension of Mr. Bennie's registration. (¶ 118)

10.     This harassment included multiple e-mails from Ms. Walter to Mr. Bennie's new broker-dealer, Prospera, requiring Prospera (a regulated entity subject to the Defendants' administrative and regulatory control) to respond to numerous questions and inquiries.  (¶ 119)

11.     Additionally, Mr. Herstein required Prospera to transmit all of Mr. Bennie's account balances to the Department on a weekly basis.  (¶ 120)  Given her position and duties, as set forth in factual allegation 2, above, it is a reasonable inference that Ms. Walter was personally involved in these inquiries regarding Bennie's account balances.

12.     Even after an official order had been issued removing the suspension of Bennie's ability to advertise and solicit new clients, and even after an on-site records inspection had confirmed there was no basis for suspending Bennie's registration, Ms. Walker demanded that Bennie's broker-dealer, Prospera, provide her detailed documentation proving Mr. Bennie had not opened any new accounts since the

December Order, in an effort to catch Mr. Bennie in a technical violation of the December Order. (¶¶ 116, 121)

13.     After fifteen-plus years of running a highly successful investment business, the timing of the Defendants' actions and harassing inquiries was not coincidental.  The Defendants' actions and inquiries were politically motivated and they colored the Defendants' unprecedented later actions and orders, including their denial of Mr. Bennie's due process rights.  (¶ 125)

14.     The Defendants, including Ms. Walter, utilized their power as government officials to treat Mr. Bennie differently than other similarly situated individuals who publicly advertise their investment services and who have been required to notify the Department of their association with a new broker-dealer.  (¶ 142)

15.     The Defendants, including Ms. Walter, knew of Mr. Bennie's political views and leadership in the Tea Party movement prior to his notifying the Department of his association with Prospera.  The Defendants' repeated baseless inquiries into Mr. Bennie's television ads, mailings, and registration demonstrate that the Defendants singled Mr. Bennie out for intentional harassment and discrimination.  (¶ 143)

16.     The content and nature of the December and February Orders caused to be issued by the Defendants against Mr. Bennie are unprecedented and unlike the treatment afforded to any prior similarly situated registrant or applicant.  (¶ 144)

17.     Defendants' actions, including those of Ms. Walter, in conducting their multiple inquiries in a harassing manner, and pressuring Mr. Bennie's broker-dealer to take punitive actions on their behalf, was intentional and motivated in whole or part by Mr. Bennie's political speech and political views.  (¶¶146, 155)

18.     The Defendants, including Ms. Walter, utilized their power as government officials to take punitive actions against Mr. Bennie due to his political views and public statements on matters of public concern in violation of his First Amendment rights. (¶ 152)

> **3.     The Amended Complaint alleges specific facts showing Defendant Munn's personal involvement in violating Bennie's constitutional rights prior to and in addition to his issuance of the Orders.**

The Defendants' brief alleges the Amended Complaint fails to include facts showing Defendant Munn's personal involvement in constitutional violations against Mr. Bennie other than with regard to the Orders signed by Munn. First of all, the Amended Complaint states claims against Munn and the other Defendants based on violations of different constitutional rights - not different categories of activity (i.e. investigations vs. Orders). The Defendants cannot re-write the Amended Complaint according to categories of their own making and then claim it is deficient. Several actions on the part of Munn, like the other Defendants, relate to each constitutional violation and, therefore, each Section 1983 claim. The issuance of the Orders implicates and impacts all three of the Section 1983 claims, not just the Due Process Claim. Furthermore, the act of placing a signature on the Orders is not the only act that led to their development, drafting, content or issuance or the denial of Due Process to Bennie. Defendant Munn, as shown below, was personally involved in far more than just signing the Orders.

The Amended Complaint goes far above and beyond the required level of factual content in its allegations against Munn under the federal rules and the plausibility standard for notice pleading with regard to all claims.  The following facts, along with the

reasonable inferences therefrom described below, are contained in the allegations in the Amended Complaint with regard to the violation of Bennie's constitutional rights by Munn.  Although some of these facts do relate to the Orders signed by Munn, they provide context to other allegations related to the five inquiries launched by Munn's department against Bennie in a period of four months prior to issuance of the Orders signed by Munn.  Furthermore, the content of the Orders themselves gives rise to additional claims against Munn beyond the due process claim since the content of the Orders shows Munn's involvement in the violation of Bennie's rights under the First Amendment and Equal Protection Clause.

1.     In the fall of 2009 Mr. Bennie aired a television commercial in which he promoted Second Amendment rights and offered to contribute $100 towards the purchase of a firearm for new clients.  After Bennie's television ad appeared, the Defendants, including Munn, embarked on a concerted scheme of harassment aimed at Mr. Bennie because of his political views as described below.  (¶¶ 27-29)

2.     Mr. Munn is the Director of the Department of Banking and Finance (the "Department") for the State of Nebraska.  Mr. Munn was duly appointed Director pursuant to Nebraska law under the Securities Act of Nebraska, Neb. Rev. Stat. § 8-1101 et seq. (the "Act").  As Director, Mr. Munn's responsibilities include the regulation of the securities industry under the Nebraska Securities Act ("the Act"), Neb. Rev. Stat. §§ 8-1101 to 8-1124.  As part of those duties, Mr. Munn oversees the conduct of all persons in Nebraska who register as agents and investment adviser representatives under the Act.  Furthermore, Mr. Munn is responsible for the training and supervision of the officers and examiners of the Department.  Additionally, Mr. Munn issues orders to

entities and persons in the securities industry, and makes those orders available to the public.  (¶ 7)

3.      The Defendants' scheme included subjecting Mr. Bennie to an unrelenting string of five (5) separate investigations within a four (4) month period related to his public political statements or advertising.  (¶ 31)   The factual allegations below show Munn's personal involvement in these multiple investigations.

4.      When Mr. Bennie and/or his broker-dealer would address one inquiry from the Defendants, they would immediately launch another inquiry.  (¶ 32)

5.      The Defendants discussed and proposed, at Department meetings, issuing official orders imposing large fines on Mr. Bennie before knowing the facts and before their inquiries were even addressed by Mr. Bennie's broker-dealer.  (¶ 33)   In light of the factual allegations in paragraph 2, above, it is reasonable to infer these proposed fines were discussed with or were made under the supervision of Munn.

6.      In February 2010, Mr. Munn received through the mail a copy of a "one-on-one" dinner invitation from Mr. Bennie related to his investment business.  (¶ 74)

7.      Rather than simply discarding the invitation, Mr. Munn forwarded the invitation on to his subordinate, Mr. Griess, and asked for him to review it for compliance.  (¶ 75)   It is reasonable to infer from this fact, taken in the context of the other factual allegations, that Munn was acting outside the normal procedure for initiation of complaints against a broker-dealer related to advertising.

8.      Soon thereafter, Mr. Griess contacted Mr. Bennie regarding the dinner invitation, and Mr. Bennie informed Mr. Griess that the invitation had been pre-approved by both FINRA and LPL's advertising compliance department.  (¶ 76)

9.     On February 18, 2010, Mr. Griess sent an e-mail to Mr. Bennie's broker dealer, LPL, regarding "yet another public communication from Bob Bennie," and attached the dinner invitation to the message.  In the body of the e-mail, Mr. Griess wrote, "As you know, we've recently discussed other communication from Mr. Bennie and pursuant to those discussions, LPL indicated that Mr. Bennie was to be assigned to a 'Senior Analyst' to review/approve communications prior to their release.  The assignment appears to be unsuccessful as this communication is non-compliant." Mr. Griess went on to state, "The Department requests that LPL provide the following information on the Senior Analyst assigned to and responsible for the review/approval of Mr. Bennie's communications with the public."  Also in the e-mail, Mr. Griess demanded, in large, bold type that all "scheduled/accepted 'one-on-one' dinner meetings are to be cancelled immediately."   Mr. Griess concluded the e-mail by threatening regulatory action against LPL: "The Department [headed by Munn] is expressly concerned, not only with the persistent, multiple, repeated acts of non-compliance, but with the continued failure of LPL to act in an appropriate manner to remedy the issues.  The Department [headed by Munn] may invoke whatever administrative action deemed necessary and appropriate under its authority against both Mr. Bennie and/or LPL Financial to insure compliance."  (¶ 77)

10.     In the February 18, 2010 e-mail, Mr. Griess expressly threatened LPL with administrative action if it did not take punitive action against Mr. Bennie for publications and advertising that Mr. Griess characterized as non-compliant, but had actually been pre-approved by FINRA and/or the LPL compliance department or which were protected First Amendment speech.  (¶ 78)  In light of the factual allegations in paragraph 2,

above, it is reasonable to infer these threats were discussed with or were made under the supervision of Munn.

11.     Later on February 18, 2010, Mr. Herstein sent an e-mail to Mr. Griess commenting on Mr. Griess' earlier threatening e-mail stating, "Excellent e-mail Rod." (¶ 79)

12.     Minutes later, Mr. Griess responded, "Thank-you kindly.  Hopefully they'll get the message loud and clear that the Department [headed by Munn] is just about to the 'end of its rope' with the crap. If not, $$$$$$$$." (¶ 80)

13.     On February 25, 2010, Defendant Munn sent an e-mail to Mr. Herstein and Mr. Griess stating, "The Governor called Mr. Bennie this morning.  Mr. Bennie told him that this is all politically motivated.  He also told him that LPL and his federal regulator okayed the materials he has been using. . . He [the Governor] asked me to keep him posted and hoped we could resolve this sooner rather than later." (¶ 83)

14.     That same day, Defendant Munn wrote a memorandum to Governor Heineman stating, "On December 7, 2009, we came into possession of a compact disk which Mr. Bennie had given to one of his clients.  The client knew one of our securities analysts and forwarded the compact disk to her.  Our analyst felt that the presentation on the compact disk was lacking some of the disclosures that Investment Advisor Representatives are required to provide when they promote their investment services or an investment product.  Investment Advisor Representatives are required to clear promotional materials they use through the Investment Advisor firm they work under. The firm in this case is LPL Financial.  Before we contacted LPL Financial to ask if they had approved the presentation on the compact disk, a television advertisement featuring Mr. Bennie appeared which contained an offer to potential clients of a $100

donation towards purchase of a firearm for those choosing to do business with him.  We again wondered if LPL Financial had approved this promotion.  In early February, I received a mailing at my home from Mr. Bennie inviting me to a one-on-one dinner with him to talk about important issues that may impact my financial goals.  A copy of the mailing is attached. . . . . When I shared the invitation with my staff, concerns were again raised about the adequacy of the disclosures contained in the mailing.  We have discussed these three concerns with LPL Financial.  They are reviewing their records to see if they did approve each of the three promotions.  Our immediate concern is LPL Financial's oversight of Mr. Bennie's activities.  We have not contacted Mr. Bennie.  We will decide about contacting him once we have a response from LPL Financial."  (¶ 84)

15.     Contrary to the assertions in Mr. Munn's memorandum to the Governor, the Defendants already knew that both the DVD presentation and the television advertisement had received pre-approval prior to their use by Mr. Bennie.  Additionally, the Defendants had already planned to impose fifty thousand dollars ($50,000.00) in fines against Mr. Bennie for these pre-approved materials at time the Governor was told the Department was just looking into whether the items had been approved.  (¶ 85)  It is reasonable to infer from these factual allegations that Munn was making misrepresentations to the Governor and/or covering up the scheme then underway against Bennie.

16.     On February 26, 2010, LPL responded to Mr. Griess' threatening e-mail about the dinner invitation [which had been originally initiated by Munn] stating, "We respectfully disagree with your assertion that the invitation is non-compliant.". . . "We believe that the invitation is compliant with firm policy and applicable securities regulations.    Further, this piece has been approved by the FINRA Advertising

Regulation Department (approval attached…) accordingly, unless you object, we would like to allow Mr. Bennie to keep future appointments he has scheduled. Finally, we strongly disagree with you allegations of 'persistent, multiple, repeated acts of non-compliance' and the 'continued failure of LPL to act in an appropriate manner to remedy the issues. Except for the missing disclosure on the eMoney Client Video, all advertisements by Mr. Bennie that you have brought to our attention were (1) properly submitted for review by Mr. Bennie; (2) properly reviewed and approved by LPL's advertising compliance unit; and (3) consistent with all applicable standards under state and federal securities laws, rule and regulations. Therefore, Mr. Bennie has not committed 'persistent, multiple, repeated acts of non-compliance,' and the firm has not failed in its duty to supervise Mr. Bennie's communications with the public." (¶ 86)

17. On March 1, 2010, Mr. Griess forwarded LPL's response e-mail about the dinner invitation to Mr. Munn, and stated, "Here is LPL's response. Let me know if you require anything further." (¶ 87)

18. On March 2, 2010, Mr. Griess sent an e-mail to LPL stating, "please find the attached Sun Life Financial Seminar recently received by our Assistant Director of Securities . . . . It's a classic example. The invitation contains no mention of LPL in this case, but honestly, what are the chances of a potential client attending this seminar, doing business from an insurance perspective only? . . . . Yet from this invitation, the potential client doesn't have a clue of Mr. Bennie's other associations. One would think, especially from a sales prospective, that Mr. Bennie would want to inform the potential client of his many financial related facets and how they all tie together. Why not disclose up front." (¶ 88) The connection of these facts to Munn is set forth below.

19.     On March 9, 2010, LPL responded to Mr. Griess' Sun Life Insurance Seminar e-mail stating, "Rod, this invitation was approved on 1/29/10 by LPL Financial. The reviewer did not require Mr. Bennie to add broker dealer disclosure as she erroneously believed he was distributing invitation on approved letterhead that contained broker dealer disclosure. We agree that LPL disclosure should have been included with invitation. We reviewed the matter with Mr. Bennie and confirmed that he will disclose his affiliation with LPL at the seminar. We also reviewed this oversight with Mr. Bennie's assigned reviewer." (¶ 89)

20.     That same day, Mr. Griess forwarded the e-mail to Mr. Munn and Mr. Herstein. (¶ 90)

21.     The next day, March 10, 2010, Mr. Herstein replied to Mr. Griess in an e-mail stating, "Was this the new 'expert reviewer'? My response to their response would be 'that's it.' We should keep this in a reserve file and move on and hopefully he [Mr. Bennie] will eventually hang himself along with LPL." (¶ 91)

22.     Later on March 10, 2010, Mr. Herstein e-mailed Mr. Munn informing Mr. Munn that he instructed Mr. Griess to "do nothing with Bennie and only keep this latest in a reserve file only." (¶ 92) It is reasonable to infer from this fact that Munn was aware of the special file being kept in his Department on Bennie which, from other e-mails, is known to have also included information on Bennie's Tea Party activities.

23.     On or about October 4, 2010 another *Lincoln Journal Star* article entitled "Tea Party: Reduce State Spending," was added to the Department's files related to Mr. Bennie. (¶ 93)

24.     On November 2, 2010, LPL abruptly terminated its relationship with Mr. Bennie. Upon information and belief, LPL's action was related to the continued

pressure and harassment from the Defendants related to Mr. Bennie, of which Mr. Munn was a part.  (¶ 94)

25.    Upon separation from LPL, Mr. Bennie performed due diligence on several other broker-dealers and promptly associated with Prospera Financial ("Prospera") effective November 23, 2010.   (¶ 95)

26.    As required by Neb. Rev. Stat. §§ 8-1103(1), (2)(d), Mr. Bennie notified the Department of the transfer of his association from LPL to Prospera by filing a U-4 form through the CRD at FINRA.  (¶ 96)

27.    On or about December 2, 2010 (a full month after abruptly terminating its relationship with Mr. Bennie) LPL made a U-5 filing in which it claimed the termination was due to violation of internal firm policies and procedures related to client signatures. (¶ 97)

28.    Immediately following LPL's termination of its broker-dealer relationship, Mr. Bennie retained, at his own expense, a qualified expert third party to perform an independent audit of his entire firm.  After reviewing all of Mr. Bennie's files, the auditor verified Mr. Bennie had not acted improperly or in violation of LPL policies and procedures during his association with LPL.  (¶ 98)

29.    On December 3, 2010, Prospera wrote a letter to the Department stating, "While we have not received any request for additional information, we believe you are reviewing Mr. Bennie's file because of the disclosures on his U4.  In order to expedite your review, Mr. Bennie has supplied the enclosed notarized statement concerning the disclosure issues.  We believe this information will help you in you decision process and permit you to enter his registration as 'Approved'." In the attachment to the letter, Prospera and Mr. Bennie provided the results of the independent audit that revealed he

had not violated any LPL policies that they claimed formed the basis of his termination. (¶ 99)  It is reasonable to infer Mr. Munn had or should have reviewed this audit report before issuing the Orders.

30.    On December 7, 2010, Mr. Griess e-mailed Mr. Herstein informing him that Prospera had contacted Mr. Griess "to see if [the Department] needed anything further to assist in expediting the registration."  Mr. Griess went on to write, "I mentioned to [Prospera] that we were merely in the preliminary stages of this and due to the severity of the reported disclosure, particularly the discharge termination from LPL, the Department in all likelihood may be inclined to perform an unannounced audit of Mr. Bennie's office."  Thereafter, Mr. Griess quoted Neb. Rev. Stat. § 8-1103(4)(a): "If no denial order is in effect and no *proceeding* is pending under subsection (9) of this section registration shall become effective at noon of the thirtieth day after an application is filed. . . ." (emphasis in the original) Mr. Griess next wrote, "May have to check with legal, but proceeding may imply formal hearing, not simply a request for more information, examination or inquiry."  (¶ 100)   It is reasonable to infer this information was discussed with Munn prior to his signing of an Order shortly thereafter. It is also reasonable to infer that since the Department was "merely in the preliminary stages of this" and still needed to do an audit, that Mr. Munn was in no position to issue Orders effectively shutting down Bennie's business.

31.    On December 17, 2010, without any contact with Mr. Bennie and without any type of notice or a hearing, Munn summarily issued an order (the "December Order")  that suspended Mr. Bennie's ability to operate his thirteen-year-old investment business by placing the following conditions on Mr. Bennie: (1) all securities and advisory activities of Bennie shall be solely limited to existing customers of Bennie, who

transfer their accounts to Prospera from LPL; (2) Bennie shall not advertise or solicit new clients; (3) Bennie will not act as a principal or in any compliance or supervisory capacity regarding the securities activities of other agents of Prospera; (4) Bennie will timely comply fully with all requests for information from the Department.  A true and correct copy of the December Order was attached as Exhibit A.  (¶ 104)

32.     Munn's December Order made findings as to Mr. Bennie's ability to serve and solicit any and all new clients without providing Mr. Bennie any form of notice of the allegations or factual support for Munn's so-called findings or an opportunity for a hearing at which Mr. Bennie could challenge those allegations.  (¶ 105)

33.     The Defendants did not even contact Mr. Bennie subsequent to Munn's surprise December Order until January 18, 2011, when they contacted his new broker-dealer, Prospera.  (¶ 106)

34.     As 60 percent to 70 percent of the revenues for Mr. Bennie's business are generated from new clients and new business, the December Order made the business economically unsustainable, and the Order severely restricted Mr. Bennie's ability to operate his business in his chosen profession and thereby earn a livelihood.  (¶ 107)

35.     Additionally, in light of the federal statutory requirements and corresponding limitations on state law, the Orders were a suspension of Mr. Bennie's registration.  (¶ 108)

36.     In addition to completely cutting off the ability to serve or even solicit new or additional clients and the vast majority of his income, Munn's December Order prevented Mr. Bennie from registering as an agent and investment adviser representative in a number of other states, as well as cutting off his business with several major insurance companies.  (¶ 109)

37.     Munn knew, or should have known, that the December Order would have a detrimental effect on Mr. Bennie's registration in other states given the reporting requirements of FINRA and the CRD, which is used by all, or nearly all, of the state securities regulators as well as the Securities and Exchange Commission through FINRA.     Additionally, the December Order was distributed publically via the Department's website.  (¶ 110)

38.     Munn's actions through the December Order effectively destroyed the value and utility of Mr. Bennie's registration and business as it instantly eliminated the source of the vast majority of his income, as well as causing existing clients to transfer their accounts, thereby making his business economically unsustainable.  (¶ 111)

39.     After the surprise December Order, Mr. Bennie made complaints to the Governor's Office, the Nebraska Attorney General, Mr. Herstein and the Department's legal counsel about the denial of notice and a hearing.  In response, Munn issued an Amended Order on February 17, 2011 (the "February Order").  Again without a hearing, the Amended Order maintained significant portions of the suspension including the prohibitions on advertising, soliciting of new clients and acting as a principal or in any compliance or supervisory capacity for other agents. A true and correct copy of the February Order was attached as Exhibit B.  (¶ 113)

40.     Although Mr. Griess had indicated on December 7, 2010, the likelihood of a Department audit of Mr. Bennie's office, it was not until March 9, 2011 that the Defendants conducted an on-site records inspection at Mr. Bennie's offices. In light of the above factual allegations, it is a reasonable inference this financially devastating delay was discussed with or approved by Munn.  (¶¶ 99, 115)

41.    After the audit of Mr. Bennie's records, the Defendants found no basis for the suspension of Mr. Bennie's registration.  (¶ 115)

42.    Finally, after three months of Mr. Bennie of being suspended from servicing any new clients or soliciting any new business, and five (5) days after their audit of Mr. Bennie's office, Munn issued an order on March 14, 2011 (the "March Order") fully approving Mr. Bennie's registration as an agent and investment adviser representative.  A true and correct copy of the March Order was attached as Exhibit C.  (¶ 116)

43.    Nowhere in the March Order did Munn acknowledge that it had determined Mr. Bennie had not acted improperly, or directly address the suspensions contained in or the implications of the December and February Orders.  (¶ 117)

44.    Upon issuance, and up until May 13, 2011, both the December and February Orders were published on the Department's public internet website, and upon information and belief, remain available by request to the public.  After repeated verbal and written requests by Mr. Bennie, the Defendants finally took down the December and February Orders from the Department's web site on May 13, 2011.  (¶ 122)  Given the factual allegations above, it is a reasonable inference the web site is under the control of Munn.

45.    At no point during the relevant period of time did Munn afford Mr. Bennie any form of notice or an opportunity to be heard.   (¶ 123)

46.    After fifteen-plus years of running a highly successful investment business, the timing of the Defendants' actions and harassing inquiries was not coincidental.  The Defendants' actions and inquiries were politically motivated and they

colored the Defendants' unprecedented later actions and orders, including their denial of Mr. Bennie's due process rights, as described above.  (¶ 125)

47.    The Defendants, including Munn, utilized their power as government officials to treat Mr. Bennie differently than other similarly situated individuals who publicly advertise their investment services and who have been required to notify the Department of their association with a new broker-dealer.  (¶ 142)

48.    The Defendants, including Munn, knew of Mr. Bennie's political views and leadership in the Tea Party movement prior to his notifying the Department of his association with Prospera.   The Defendants repeated baseless inquiries into Mr. Bennie's television ads, mailings, and registration demonstrate that the Defendants singled Mr. Bennie out for intentional harassment and discrimination.  (¶ 143)

49.    The content and nature of the December and February Orders caused to be issued by Munn against Mr. Bennie are unprecedented and unlike the treatment afforded to any prior similarly situated registrant or applicant.  (¶ 144)

50.    Defendants' actions in issuing their Orders, conducting their multiple inquiries in a harassing manner, and pressuring Mr. Bennie's broker-dealer to take punitive actions on their behalf, was intentional and motivated in whole or part by Mr. Bennie's political speech and political views.  (¶¶ 146, 155)

51.    The Defendants, including Munn, utilized their power as government officials to impose penalties and to take other punitive actions against Mr. Bennie due to his political views and public statements on matters of public concern in violation of his First Amendment rights.  (¶ 152)

**4.    The Amended Complaint alleges specific facts showing Defendant Griess' personal involvement in violating Bennie's constitutional rights with regard to issuance of the Orders.**

The Defendants' brief alleges the Amended Complaint fails to include facts showing Defendant Griess' personal involvement in constitutional violations against Mr. Bennie related to issuance of the Orders.  First of all, the Amended Complaint states claims against Griess based on violations of different constitutional rights - not different categories of activity (i.e. investigations vs. orders).  The Defendants cannot re-write the Amended Complaint according to categories of their own making, and then claim it is deficient.  Several actions on the part of Griess, like the other Defendants, relate to each constitutional violation and, therefore, each Section 1983 claim.  Second, the issuance of the Orders implicates and impacts all three of the Section 1983 claims, not just the Due Process Claim. Finally, the act of placing a signature on the Orders (by Defendant Munn) is not the only act that led to their development, drafting, content or issuance or the denial of Due Process to Bennie. Defendant Griess, as shown below, was personally involved in evading the normal hearing process.

The Amended Complaint goes above and beyond the required level of factual content in its allegations against Griess under the federal rules and the plausibility standard for notice pleading with regard to all claims stemming from or including issuance of the Orders.  The following facts, along with the reasonable inferences therefrom described below, are contained in the allegations against Griess in the Amended Complaint with regard to the violation of Bennie's constitutional rights through the issuance of the Orders.  Although many of these facts do relate to matters other than the Orders, they provide context as to how and why the Orders were issued and why the Orders were written the way they were. Many of these factual allegations relate

to the five inquiries launched with Griess' direct personal participation against Bennie in a period of four months.  These five inquiries were a precursor to issuance of the Orders.  In addition, the allegations in the Amended Complaint regarding the content of the Orders themselves show Griess' culpability since the orders were aimed directly and specifically at Bennie's advertising and public communications (the subject of Griess' five inquiries) rather than at the alleged conduct which was given as the pretext for issuance of the Orders (alleged violation of internal LPL policies regarding client signatures on forms).

1.     Mr. Griess is the Investigation and Compliance Unit Supervisor for the Bureau of Securities for the State of Nebraska. Mr. Griess is charged with registration and compliance matters related to agents and investment adviser representatives to ensure compliance with the Act and State regulations promulgated by the Department in accordance with the Act.  (¶ 9)

2.     In the fall of 2009 Mr. Bennie aired a television commercial in which he promoted Second Amendment rights and offered to contribute $100 towards the purchase of a firearm for new clients.  Mr. Griess derisively referred to Mr. Bennie's television ad as the "gun slingin ad." After Bennie's television ad appeared, the Defendants, including Griess, embarked on a concerted scheme of harassment aimed at Mr. Bennie because of his political views as described below.  (¶¶ 27-29)

3.     Griess' scheme included subjecting Mr. Bennie to an unrelenting string of five (5) separate investigations within a four (4) month period related to his public political statements or advertising.  (¶ 31)

4.     When Mr. Bennie and/or his broker-dealer would address one inquiry from the Defendants, they would immediately launch another inquiry. Mr. Griess personally participated in this activity as described below.  (¶ 32)

5.     Griess discussed and proposed orders imposing large fines on Mr. Bennie before knowing the facts and before their inquiries were even addressed by Mr. Bennie's broker-dealer.  (¶¶ 33, 51)

6.     In November 2009, an unknown securities analyst at the Department obtained an old DVD containing a short, professionally produced presentation distributed by Mr. Bennie to select clients, and reviewed it for regulatory compliance.  (¶ 34) In light of the factual allegations above it is reasonable to infer this analyst was acting under the direction of Mr. Griess due to his position and duties.

7.     The DVD presentation explains a service available to Mr. Bennie's clients called "eMoney," which is not an investment product or a sales promotion item.  eMoney is computer software that allows Mr. Bennie's customers to organize and access their account balances and other key documents electronically.  (¶ 35)

8.     The DVD was well over two (2) years old at the time the Defendants reviewed the presentation.  (¶ 36)

9.     On or about November 16, 2009, Griess contacted LPL and alleged that the DVD should contain additional disclosure language regarding Mr. Bennie's investment adviser services.   While the DVD contained the disclosure, "Securities offered through Linsco Private Ledger," Mr. Griess asserted it should have also stated, "Investment advisory services offered through Linsco Private Ledger."  (¶ 37)

10.     Whereas the DVD pertains to a computer software service to organize and access documents, it is not clear whether any disclosure was needed.  Nevertheless,

after a series of discussions and e-mails over a month-long period with Mr. Griess, LPL consented to Mr. Griess' request to add the disclosure, and e-mailed him a response indicating such.  (¶ 38)

11.    On or about December 17, 2009, Mr. Griess forwarded LPL's e-mail confirming their agreement to add the additional disclosure to Mr. Herstein. Herstein, who is Griess' boss, wrote in reply, "Bob [Bennie] is always seen wearing a cowboy hat lately, so I say 'Hang Him High'."  (¶ 39)

12.    Mr. Herstein's "Hang Him High" instruction to Griess is a direct reference to Mr. Bennie's television advertisements.  Mr. Bennie owns horses, and was shown riding a horse and wearing a western-style "cowboy" hat in the television advertisement. (¶¶ 26-28, 40)

13.    Shortly after being instructed by his boss to "hang [Mr. Bennie] high" Griess self-initiated a complaint against Mr. Bennie to the Department regarding Bennie's TV ad (which had stopped being aired prior to the time of the complaint).  The complaint simply stated, "Television advertisement *entered for tracking purposes." (¶ 41)  Based on the facts alleged it is a reasonable inference Griess was acting on his boss' instructions and was proceeding with a regulatory lynching of Mr. Bennie.

14.    Although Mr. Griess self-initiated the complaint against Mr. Bennie for his television advertisement, he did not state the basis for the complaint on the form he filed.  (¶ 42)

15.    At the time the complaint was initiated, the television advertisement, which had been running since August, had actually stopped being aired three days earlier. (¶ 43)

16.     Also on or about December 30, 2009, Mr. Griess telephoned LPL to discuss his self-initiated complaint against Mr. Bennie's television advertisement, and Mr. Griess also sent LPL a letter on Department letterhead regarding, "R. Bennie Television Advertisement."  In the letter, Mr. Griess wrote, "Upon receipt, please review DVD and feel free to respond via email.  At this time, the Department would like to know if Mr. Bennie sought approval of the advertisement and content therein through LPL Compliance.   Segment 1 of the DVD contains a partial run of the advertisement referencing $100 towards the purchase of a firearm."  Mr. Griess signed the letter as "Securities Investigation and Compliance Unit Supervisor."  (¶ 44)

17.     In response to Mr. Griess' letter about the television advertisement, LPL responded on January 14, 2010 in an e-mail to Mr. Griess that it was "double checking our cash/non-cash compensation policy internally" and would follow-up with Mr. Griess. (¶ 45)

18.     LPL's response correctly identified that the only issue related to the applicable rules on agents and advisers giving away cash or gifts, and should have had nothing to do with the political content of the advertisement.  (¶ 46)

19.     As a professional regulator, Mr. Griess should have known the rules regarding gifts, or should have reacquainted himself with the rules regarding gifts prior to his initiating a complaint against Mr. Bennie and confronting a regulated entity, in his official capacity, about an advertisement containing political content.  (¶ 47)

20.     Mr. Griess was or should have been aware of FINRA Rule 3220 which provides that regulated entities and their agents are not permitted to give anything of value in excess of one hundred dollars ($100) per individual per year to any person

where such payment is in relation to the business. This is exactly the amount of the offer in Mr. Bennie's ad.  (¶ 48)

21.    Only one day after he received LPL's initial e-mail response, wherein LPL stated it would follow up with him, Mr. Griess sent an e-mail on January 15, 2010 to Mrs. Sheila Cahill ("Ms. Cahill"), Legal Counsel for the Department, stating, "Just wanted to recap on the orders I spoke of at the [Department] meeting."  "2. Bob Bennie – Jack [Herstein] has suggested 25K per violation of which we have 2. Failing to disclose IA [investment adviser] business on the CD featuring Bennie and the "Do business with me and I'll put forth $100 towards the purchase of a firearm for you" (I suspect this one didn't get [LPL] Compliance approval, but it's just a guess at this point.) I'm currently corresponding with LPL Compliance and will keep you posted."  (¶ 49)

22.    Mr. Griess and Mr. Herstein were proposing fines against Mr. Bennie before any investigation and without a legitimate basis.  They were discussing orders to fine Mr. Bennie $25,000.00 for the television advertisement while admitting that they had not even verified whether the advertisement had been pre-approved.  (¶ 50)

23.    On January 15, 2010, Mr. Griess sent an e-mail to Mrs. Walter stating, "[A]s it stands right now I'm planning on hitting Mr. Bennie up for about $50K (2 ad violations @ $25K/ea.)  We'll see where it goes."  (¶ 51)

24.    On February 1, 2010, the *Lincoln Journal Star* ("LJS") newspaper published an article with the headline, "Bennie acts as Lincoln's Tea Party Voice." (¶ 52)

25.    The LJS article mentioned Mr. Bennie's television advertisement, and included quotations from Mr. Bennie expressing criticism of both major political parties and several political figures, including, Mr. Bennie's political opinion regarding Senator

Ben Nelson and President Obama.  The article also included separate criticisms by Mr. Bennie of the Republican Party and some of its leaders.  A copy of the entire LJS article was kept by the Defendants in the Department's files.  (¶ 53)

26.    The very day the article was published (February 1, 2010), Mr. Griess immediately contacted LPL (Bennie's broker-dealer) and subjected them (a regulated entity subject to his administrative and regulatory control) to his ire regarding the comments by Bennie. Griess included an internet link to the LJS article and re-typed quotes from the article criticizing President Obama. (¶ 54)

27.    Within days of the February 1 LJS article reporting on Bennie's Tea Party activities, Mr. Griess contacted Mr. Bennie and informed him that he had started an inquiry into Mr. Bennie's television advertisement (even though the ad, which had been running since August of 2009, had been off the air since December).  (¶ 55)

28.    During that conversation, Mr. Bennie informed Mr. Griess that the advertisement stopped running in December of 2009 and that the advertisement had been pre-approved by LPL's advertising compliance section prior to airing.  (¶ 56)

29.    On February 2, 2010, Mr. Griess sent an e-mail to Ms. Cahill stating, "I've scheduled a conference call with LPL concerning Bob Bennie and his recent string of activities; i.e. lack of IA disclosure, gun slingin ads, and calling Obama a 'communist' and an 'evil' man issues. . . . Would like to have you present if you can make it. Jack's [Mr. Herstein] coming too." (¶ 50)

30.    On February 2, 2010, Ms. Cahill responded to Mr. Griess' e-mail stating, "Count me in.  I think we probably need to have a brief discussion prior to the call about the concerns being raised and the way in which we will raise those concerns.  The last thing we want is a Journal Star headline reading something like 'State interferes with

Bennie's free speech.' In addition, we need to be mindful of potential political ramifications – given the party affiliation of Bennie and the current administration." (¶ 59)   The e-mail from the Bureau's legal counsel reasonably indicates Griess' participation in the pre-conference discussion about the "political ramifications – given the party affiliation of Mr. Bennie."

31.   Although Griess was well aware of the implications of his actions with regard to Mr. Bennie's First Amendment rights, he decided to disregard those rights. (¶ 60)

32.   Griess used his regulatory position and power to schedule a conference call with a regulated entity to complain about Mr. Bennie's statements criticizing President Obama, while privately noting they must be careful due to the party affiliation of Bennie and the Governor.  (¶ 61)

33.   On February 3, 2010, an LPL representative responded to the request for a conference call stating that he would be joined on the call by LPL's Associate Counsel, Mr. Ken Juster.  (¶ 62)

34.   On February 4, 2010, Mr. Griess e-mailed LPL and scheduled the requested conference fall for February 8th.  Mr. Griess also told LPL, "On a side note for discussion Monday also, should LPL anticipate imposing any kind of heightened supervision, more frequent/unannounced exam schedule, specialized advertisement approval process or other sanction(s) that may provide the Department with a little better sense that the firm is 'on top of' addressing this type of activity which in turn may be of some comfort to us and really is in the best interest of the public, would be nice to know also."  (¶ 63)

35.     Mr. Griess' e-mail demonstrates that he used his official position and regulatory authority to pressure LPL, a regulated entity, to sanction Mr. Bennie for his political speech, even after having been warned by the Department's Legal Counsel about concerns regarding Mr. Bennie's First Amendment rights.  (¶ 64)  It is reasonable to infer from these facts that Griess was using his position to avoid direct sanctions by the Department (due to counsel's advice) and that he instead pressured LPL into imposing adverse measures.

36.     According to handwritten notes dated February 4, 2010, and maintained in the Department's files, LPL had informed the participants in the meeting, including Griess, that both Mr. Bennie's television advertisement and the eMoney DVD had been approved by LPL's advertising compliance section prior to their use.  (¶ 65)

37.     On February 8, 2010, prior to the scheduled conference call between Mr. Griess, Mr. Herstein, Ms. Cahill, and LPL officials, Mr. Griess e-mailed LPL stating, "we have yet to receive the requested documents in preparation for today's call."  The documents requested pertained to Mr. Bennie's "gun" ad and the Tea Party article. (¶ 66)

38.     Also prior to the conference call with LPL, Ms. Cahill sent Mr. Griess an e-mail asking, "Did LPL ever send the copy of the approved script for Bennie's gun ad?" (¶ 67)  In light of factual allegations above, it is a reasonable inference Griess was aware of the request since he was a participant in the meeting for which the documentation was requested.

39.     In response to Mr. Griess' request for documentation on approval by LPL of the television advertisement and the Tea Party article, LPL wrote, "I have attached

the paperwork associated with the review of the TV commercial.  The newspaper article was not submitted for review."  (¶ 68)

40.    The attached documentation submitted by LPL showed that the television advertisement had been reviewed by LPL's advertising compliance analyst and one version of the advertisement was "approved with changes/comments" on September 7, 2009, and another version had been "approved as is" on September 11, 2009.  (¶ 69)

41.    Handwritten notes from the conference call between LPL and Griess, et al. indicate that a reporter from the Lincoln Journal Star had approached Mr. Bennie to conduct the interview that resulted in the news article on Bennie's Tea Party activities being investigated by Griess and the other Defendants.  The notes also show that LPL was instructed by the participants in the conference (which included Griess) to discuss the concerns that they had with the "gun" ad with Bennie, and that they were informed other LPL registered agents also had a similar practice of offering gift cards and certificates.  Finally, the notes show that as a result of the pressure from the participants in the conference (which included Griess), LPL agreed that Bennie would be reassigned to a Senior Analyst for closer supervision of his public communications.  (¶ 71)

42.    Additional handwritten notes contained in the Department's files from the conference call summarize the call, including: that LPL had approved Mr. Bennie's DVD presentation; that the Tea Party article was not submitted to LPL prior to publication for review, but that LPL would pay additional attention and talk with Mr. Bennie about the LJS article; that "B[ob] B[ennie] received call from Don Walton to ask for interview (as one of Tea Party, strong Republican),"; that LPL was of the view the interview was not related to Mr. Bennie's or LPL's business; that LPL informed the participants in the conference that other registered agents provided customers with gift certificates for

doing business with the registered agent, but that LPL was unsure if any others contained specific references to firearms; that, at the participants'(which included Griess) request, LPL would provide the number of gift cards for guns Mr. Bennie had given out; that LPL had talked with Mr. Bennie the week prior and expressed concerns about the advertisement due to Defendants' inquiries; that Mr. Bennie had agreed to take the advertisement off the air; that the participants (which included Griess) questioned LPL on what were its policies and guidelines regarding registered agents expressing their political views; that LPL responded that it did not have any policies or guidelines on registered agents expression of their political views; and, that as a result of the call from their regulators, LPL would reassign Mr. Bennie to an LPL senior analyst for special supervision.  (¶ 72)

43.     In an e-mail dated February 10, 2010, labeled "follow up to items requested on 2.8.10," LPL wrote to Mr. Griess, "See questions and answers below regarding the items we discussed on Monday."  In the content of the e-mail, LPL replied that Bennie had discontinued the television advertisement on December 27th because he had "found it to be ineffective, and that Bennie had distributed one (1) gift card related to that advertisement.  Additionally, LPL communicated that it "does not have any specific guidelines that focus on communicating political views to the public."  (¶ 73)

44.     Later in February 2010, Mr. Griess' boss, Mr. Munn, received through the mail a copy of a "one-on-one" dinner invitation from Mr. Bennie related to his investment business.  (¶ 74)

45.     Rather than simply discarding the invitation, Mr. Munn forwarded the invitation on to Mr. Griess and asked for him to review it.  (¶ 75)  Soon thereafter, Mr. Griess  contacted  Mr. Bennie  regarding  the  dinner  invitation,  and  Mr. Bennie

informed Mr. Griess that the invitation had been pre-approved by both FINRA and LPL's advertising compliance department.  (¶ 76)

46.    On February 18, 2010, Mr. Griess sent an e-mail to Mr. Bennie's broker dealer, LPL, regarding "yet another public communication from Bob Bennie," and attached the dinner invitation to the message.  In the body of the e-mail, Mr. Griess wrote, "As you know, we've recently discussed other communication from Mr. Bennie and pursuant to those discussions, LPL indicated that Mr. Bennie was to be assigned to a 'Senior Analyst' to review/approve communications prior to their release.   The assignment appears to be unsuccessful as this communication is non-compliant." Mr. Griess went on to state, "The Department requests that LPL provide the following information on the Senior Analyst assigned to and responsible for the review/approval of Mr. Bennie's communications with the public."  Also in the e-mail, Mr. Griess demanded, in large, bold type that all "scheduled/accepted 'one-on-one' dinner meetings are to be cancelled immediately."   Mr. Griess concluded the e-mail by directly threatening regulatory action against LPL: "The Department is expressly concerned, not only with the persistent, multiple, repeated acts of non-compliance, but with the continued failure of LPL to act in an appropriate manner to remedy the issues.  The Department may invoke whatever administrative action deemed necessary and appropriate under its authority against both Mr. Bennie and/or LPL Financial to insure compliance."  (¶ 77)

47.    In the February 18, 2010 e-mail, Mr. Griess expressly threatened LPL with administrative action by the Department if it did not take punitive action against Mr. Bennie for publications and advertising that Mr. Griess characterized as non-compliant, but had actually been pre-approved by FINRA and/or the LPL compliance department or which were protected First Amendment speech.  (¶ 78)

48.    Later on February 18, 2010, Mr. Herstein sent an e-mail to Griess commenting on Griess' earlier threat against LPL stating, "Excellent e-mail Rod."  (¶ 79)

49.    Minutes later, Mr. Griess responded to Herstein, "Thank-you kindly. Hopefully they'll get the message loud and clear that the Department is just about to the 'end of its rope' with the crap. If not, $$$$$$$$."  (¶ 80)  The reasonable inference from these facts is that Griess wanted to impose large fines on Bennie related to his "gun slingin" ad, and his criticisms of President Obama.

50.    On February 26, 2010, LPL responded to Griess' threatening e-mail of the 18th, strongly refuting the allegations and noting the communications in question had been pre-approved for Bennie's use.  LPL stated that Bennie had not committed the acts of non-compliance asserted in Griess' e-mail and LPL had "not failed in its duty to supervise Mr. Bennie's communications with the public."  (¶ 86)

51.    Griess received this strongly-worded refutation from LPL on February 26 and shared it with Mr. Munn on March 1, 2010.  Munn then asked to meet with Griess on March 2 "before I get back to the Governor." (¶¶ 86, 87)

52.    Despite having been put in his place by LPL with regard to previous baseless allegations, or perhaps because of having been, Mr. Griess immediately launched yet another salvo at Bennie and LPL on March 2, 2010 and sent an e-mail to LPL stating, "please find the attached Sun Life Financial Seminar recently received by our Assistant Director of Securities . . . . It's a classic example.  The invitation contains no mention of LPL in this case, but honestly, what are the chances of a potential client attending this seminar, doing business from an insurance perspective only? . . . . Yet from this invitation, the potential client doesn't have a clue of Mr. Bennie's other associations.  One would think, especially from a sales prospective, that Mr. Bennie

would want to inform the potential client of his many financial related facets and how they all tie together.  Why not disclose up front."  (¶ 86)

53.    On March 9, 2010, LPL responded to Mr. Griess' Sun Life Insurance Seminar e-mail stating, "Rod, this invitation was approved on 1/29/10 by LPL Financial. The reviewer did not require Mr. Bennie to add broker dealer disclosure as she erroneously believed he was distributing invitation on approved letterhead that contained broker dealer disclosure.  We agree that LPL disclosure should have been included with invitation.  We reviewed the matter with Mr. Bennie and confirmed that he will disclose his affiliation with LPL at the seminar.  We also reviewed this oversight with Mr. Bennie's assigned reviewer."  (¶ 89)  From these facts it is a reasonable inference that the message being sent to LPL by Griess on March 2nd was that no matter what they did to refute his allegations, he would keep pressuring LPL as long as Bennie was associated with them.

54.    That same day, Griess forwarded this e-mail to Mr. Herstein.  (¶ 90)

55.    The next day, March 10, 2010, Mr. Herstein replied to Mr. Griess in an e-mail stating, "Was this the new 'expert reviewer'?  My response to their response would be 'that's it.'  We should keep this in a reserve file and move on and hopefully he [Mr. Bennie] will eventually hang himself along with LPL."  (¶ 91)

56.    Griess then replied to Herstein that he had printed a copy of the LPL e-mail and placed it "in the reserve file" which he kept on Mr. Bennie.  From the facts alleged it can be reasonably inferred that Griess was planning on future action against Bennie when he would "hopefully hang himself along with LPL."  (¶ 92)

57.    In August of 2010, just weeks after its annual on-site compliance audit of Bennie, LPL conducted a second surprise audit of Bennie.  Frequent surprise audits of Bennie by LPL were one of the measures urged by Griess after department counsel had cautioned him against direct action against Bennie.  (¶ 63)

58.    On or about October 4, 2010 another LJS article entitled "Tea Party: Reduce State Spending," was placed in the Department's files related to Mr. Bennie. (¶ 93)  This article had nothing to do with Griess' official duties or the Departments' regulatory authority. Like the February article which led to threats against LPL by Griess, this article also contained criticism of President Obama.  In light of factual allegations above, it is a reasonable inference this article was placed in the Department's files by or with the approval of Griess and may have been discussed with LPL like the earlier article.

59.    On November 2, 2010, LPL abruptly terminated its relationship with Mr. Bennie.  LPL's action was related to the continued pressure and harassment from Griess and the other defendants related to Mr. Bennie.  (¶ 94)

60.    Upon separation from LPL, Mr. Bennie performed due diligence on several other broker-dealers and promptly associated with Prospera Financial ("Prospera") effective November 23, 2010.  (¶ 95)  As required by Neb. Rev. Stat. §§ 8-1103(1), (2)(d), Mr. Bennie notified the Department of the transfer of his association from LPL to Prospera by filing a U-4 form through the CRD at FINRA.  (¶ 96)

61.    On or about December 2, 2010 (a full month after abruptly terminating its relationship with Mr. Bennie) LPL made a U-5 filing with the Securities Bureau in which it claimed the termination was due to violation of internal firm policies and procedures related to client signatures.  (¶ 97)

62.     Immediately following LPL's termination of its broker-dealer relationship, Mr. Bennie retained, at his own expense, a qualified expert third party to perform an independent audit of his entire firm.  After reviewing all of Mr. Bennie's files, the auditor verified Mr. Bennie had not acted improperly or in violation of LPL policies and procedures during his association with LPL.  (¶ 98)

63.     On December 3, 2010, Prospera wrote a letter to the Department stating, "While we have not received any request for additional information, we believe you are reviewing Mr. Bennie's file because of the disclosures on his U4.  In order to expedite your review, Mr. Bennie has supplied the enclosed notarized statement concerning the disclosure issues.  We believe this information will help you in you decision process and permit you to enter his registration as 'Approved'." In the attachment to the letter, Prospera and Mr. Bennie provided the results of the independent audit that revealed he had not violated any LPL policies that they claimed formed the basis for his termination. (¶ 99)

64.     On December 7, 2010, Mr. Griess e-mailed Mr. Herstein informing him that Prospera had written "to see if [the Department] needed anything further to assist in expediting the registration."  Mr. Griess went on to write, "I mentioned to [Prospera] that we were merely in the preliminary stages of this and due to the severity of the reported disclosure, particularly the discharge termination from LPL, the Department in all likelihood may be inclined to perform an unannounced audit of Mr. Bennie's office." Thereafter, Mr. Griess quoted Neb. Rev. Stat. § 8-1103(4)(a): "If no denial order is in effect and no *proceeding* is pending under subsection (9) of this section registration shall become effective at noon of the thirtieth day after an application is filed. . . ." (emphasis in the original) Mr. Griess next wrote to Herstein, "May have to check with

legal, but proceeding may imply formal hearing, not simply a request for more information, examination or inquiry." (¶ 100)  From these facts it is reasonable to infer Griess was actively seeking a way to postpone or suspend approval of Bennie's registration without granting him a hearing.

65.     Also in the December 7, 2010, e-mail Mr. Griess informed Mr. Herstein that the Department had received a "plea for assistance/expedition dated December 3, 2010" from Prospera. (¶ 102)

66.     On December 17, 2010, without any contact with Mr. Bennie and without any type of notice or opportunity for a hearing, the Department summarily issued an order (the "December Order") signed by Mr. Munn that suspended Mr. Bennie's ability to operate his thirteen-year-old investment business by placing the following conditions on Mr. Bennie: (1) all securities and advisory activities of Bennie shall be solely limited to existing customers of Bennie, who transfer their accounts to Prospera from LPL; (2) Bennie shall not advertise or solicit new clients; (3) Bennie will not act as a principal or in any compliance or supervisory capacity regarding the securities activities of other agents of Prospera; (4) Bennie will timely comply fully with all requests for information from the Department.  A true and correct copy of the December Order was attached as Exhibit A.  (¶ 104)  In light of factual allegations above, it is a reasonable inference this order was drafted and issued with the direct input and assistance of Mr. Griess.

67.     The December Order made findings as to Mr. Bennie's ability to serve and solicit any and all new clients without providing Mr. Bennie any form of notice of the allegations or factual support for the so-called findings or an opportunity for a hearing at which Mr. Bennie could challenge those allegations.  (¶ 105)   In light of factual

allegations above, it is a reasonable inference this order was drafted and issued with the direct input and assistance of Mr. Griess.

68.    The Defendants, including Griess, did not even contact Mr. Bennie subsequent to their surprise December Order until January 18, 2011, when they contacted his new broker-dealer, Prospera. (¶ 106)

69.    As 60 percent to 70 percent of the revenues for Mr. Bennie's business are generated from new clients and new business, the December Order made his business economically unsustainable, and the Order severely restricted Mr. Bennie's ability to operate his business in his chosen profession and thereby earn a livelihood. (¶ 107)

70.    Additionally, in light of the federal statutory requirements and corresponding limitations on state law, the Orders were a suspension of Mr. Bennie's registration. (¶ 108)

71.    In addition to completely cutting off the ability to serve or even solicit new or additional clients and the vast majority of his income, the December Order prevented Mr. Bennie from registering as an agent and investment adviser representative in a number of other states, as well as cutting off his business with several major insurance companies. (¶ 109)  In light of factual allegations above, including his position and duties, it is a reasonable inference Griess was well aware of the impact the order would have on Bennie.

72.    Griess knew, or should have known, that the December Order would have a detrimental effect on Mr. Bennie's registration in other states given the reporting requirements of FINRA and the CRD, which is used by all, or nearly all, of the state securities regulators as well as the Securities and Exchange Commission through FINRA. (¶ 110)

73.     Griess' actions which led to the December Order effectively destroyed the value and utility of Mr. Bennie's registration and business as it instantly eliminated the source of the vast majority of his income, as well as causing existing clients to transfer their accounts, thereby making his business economically unsustainable.  (¶ 111)

74.     After the surprise December Order, Mr. Bennie made complaints to the Governor's Office, the Nebraska Attorney General, Mr. Herstein and the Department's legal counsel about the denial of notice and a hearing.  In response, an Amended Order was issued on February 17, 2011 (the "February Order").  Again without a hearing, the Amended Order maintained significant portions of the suspension including the prohibitions on advertising, soliciting of new clients and acting as a principal or in any compliance or supervisory capacity for other agents. A true and correct copy of the February Order was attached as Exhibit B.  (¶ 113) In light of factual allegations above, it is a reasonable inference this order was drafted and issued with the direct input and assistance of Mr. Griess.

75.     Although Bennie's broker-dealer had requested an expedited review of the U5 filing in early December of 2010, and although Mr. Griess had indicated on December 7, 2010, the likelihood of a Department audit of Mr. Bennie's office, it was not until March 9, 2011 that an on-site records inspection was conducted at Mr. Bennie's offices.  In light of factual allegations above, it is reasonable to assume this financially devastating delay was approved by Griess.  (¶¶ 99, 115)

76.     After the audit of Mr. Bennie's records, the Defendants, including Griess found no basis for the suspension of Mr. Bennie's registration.  (¶ 115)

77.     Finally, after three months of Mr. Bennie of being suspended from servicing any new clients or soliciting any new business, and five (5) days after their

audit of Mr. Bennie's office, an order was issued on March 14, 2011 (the "March Order") fully approving Mr. Bennie's registration as an agent and investment adviser representative.  A true and correct copy of the March Order was attached as Exhibit C. (¶ 116)  In light of factual allegations above, it is reasonable to assume this order was drafted and issued with the direct input and assistance of Mr. Griess.

78.   Nowhere in the March Order did the Department acknowledge that it had determined Mr. Bennie had not acted improperly, or directly address the suspensions contained in or the implications of the December and February Orders.  (¶ 117)

79.   Despite finding no basis for the suspension of Mr. Bennie's registration during its on-site inspection or otherwise from December 2010 to March 14, 2011, the Defendants persisted with harassing inquiries and numerous demands for records and information regarding Mr. Bennie. These inquiries were wholly unrelated to the initial allegations, and persisted through April of 2011- more than a month after the lifting of the suspension of Mr. Bennie's registration.  (¶ 118)  In light of factual allegations above, including his duties and his position, it is a reasonable inference this activity persisted with the direct input and assistance of Mr. Griess.

80.   Upon issuance, and up until May 13, 2011, both the December and February Orders were published on the Department's public internet website, and upon information and belief, remain available by request to the public.  After repeated verbal and written requests by Mr. Bennie, the Defendants finally took down the December and February Orders from the Department's web site on May 13, 2011.  (¶ 122)

81.   At no point during the relevant period of time did Defendants afford Mr. Bennie any form of notice or an opportunity to be heard.  (¶ 123)

82.    After fifteen-plus years of running a highly successful investment business, the timing of the Defendants' (including Griess) actions and harassing inquiries was not coincidental.  The Defendants' actions and inquiries were politically motivated and they colored the Defendants' unprecedented later actions and orders, including their denial of Mr. Bennie's due process rights, as described above.  (¶ 125)

83.    The Defendants, including Griess, utilized their power as government officials to treat Mr. Bennie differently than other similarly situated individuals who publicly advertise their investment services and who have been required to notify the Department of their association with a new broker-dealer.  (¶ 142)

84.    The Defendants, including Griess, knew of Mr. Bennie's political views and leadership in the Tea Party movement prior to his notifying the Department of his association with Prospera.  The Defendants' repeated baseless inquiries into Mr. Bennie's television ads, mailings, and registration demonstrate that the Defendants singled Mr. Bennie out for intentional harassment and discrimination.  (¶ 143)

85.    The content and nature of the December and February Orders caused to be issued by the Defendants against Mr. Bennie are unprecedented and unlike the treatment afforded to any prior similarly situated registrant or applicant.  (¶ 144)

86.    Defendants' actions in issuing their Orders, conducting their multiple inquiries in a harassing manner, and pressuring Mr. Bennie's broker-dealer to take punitive actions on their behalf, was intentional and motivated in whole or part by Mr. Bennie's political speech and political views.  (¶146)

87.    The Defendants, including Griess, utilized their power as government officials to impose penalties and to take other punitive actions against Mr. Bennie due to

his political views and public statements on matters of public concern in violation of his

First Amendment rights.  (¶ 152)

**B.    The Amended Complaint Must Be Read As A Whole And The Sufficiency Of The Factual Allegations Must Be Assessed In The Entirety Of The Pleading.**

The basic premise of the Defendants' argument regarding the sufficiency of the

Amended Complaint is flawed in that the Defendants seek to read each factual

allegation in isolation and then assert that no claim has been stated. This attempted

vivisection of the Amended Complaint is not consistent with the governing rules or case

law. The Amended Complaint must be read as a whole and the sufficiency of the factual

allegations must be assessed in light of the entirety of the pleading. Furthermore, the

plaintiff is entitled to all reasonable inferences that can be drawn from the allegations

contained in the Amended Complaint.

In *McGee v. Hester*, 724 F.2d 89 (8th Cir. 1983), the Eight Circuit Court of

Appeals considered a claim based on a series of individual actions taken by

government officials in the course of their investigation of the plaintiff.  Specifically,

members of a state commission, while investigating plaintiff's business practices,

parked in the plaintiff's parking lot for long periods of time, took pictures of customers

leaving the plaintiff's store, wrote down license plate numbers of customers and

followed some of those same customers inside the store.  *Id.* at 90.  While none of

these individual actions taken in isolation are illegal acts or violations of the plaintiff's

rights, the Court of Appeals found, "At some point, the methods of surveillance become

so intrusive as to violate the clearly established property right [of the plaintiff] of which a

reasonable person would have known."  *Id.* at 92.  While *McGee* was being considered

under the summary judgment standard, the case demonstrates that the individual actions by the Defendants cannot be viewed in isolation from the totality of the situation.

Similar to the individual defendants' actions in *McGee*, the Defendants' actions here, as alleged in the Amended Complaint, amounted to a coordinated and deliberate scheme of harassment by the Defendants using their official positions and authority to punish and discredit a private citizen under their regulatory control and damage his business based on his political views, public statements and the exercise of his constitutional rights. It is also reasonable to infer from the allegations that the Defendants' actions were meant to discourage all those associated with Bennie, including his broker-dealer, investment adviser and customers. These facts are sufficient to allege a claim under the plausibility standard. *See Easter House v. Felder*, 910 F.2d 1387, 1407 (7th Cir. 1990) ("Clearly, an unwarranted investigation by licensing officials conducted in a manner calculated to discourage customers or interfere with a licensee's business may violate a property right."). Therefore, the Defendants' individual actions cannot be viewed in isolation; instead they must be considered in the entirety of the situation. Additionally, Defendants' attempt to isolate each action is contrary to the liability which supervisors are subject to when they fail to properly supervise and train their employees who cause a constitutional deprivation. *See Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir. 1996)(stating, "a supervisor may be held individually liable under § 1983 if he directly participates in a constitutional violation or if a failure to properly supervise and train the offending employee caused a deprivation of constitutional rights.") (citing *Tilson v. Forrest City Police Dep't*, 28 F.3d 802, 806 (8th Cir. 1994)).

Ultimately, when read in its entirety, Bennie's thirty-plus page Amended Complaint provides more than enough factual support for the allegations to demonstrate that his rights have been violated, and that this violation occurred due to each Defendant's individual actions and participation.  The Amended Complaint also clearly gives each individual Defendant ample factual basis to notify them of their alleged participation.  Therefore, Plaintiff's Amended Complaint easily satisfies Fed. R. Civ. P. 12(b)(6) and the Supreme Court's probability standard as detailed in *Ashcroft v. Iqbal*.

## II.   BENNIE HAS A PROTECTED PROPERTY INTEREST IN HIS REGISTRATION UNDER NEBRASKA LAW.

Under Nebraska law, a broker-dealer agent or an investment adviser representative cannot engage in their occupation without first being registered with the Department of Banking and Finance. Bennie has been registered as an agent and investment adviser representative with the Nebraska Department of Banking and Finance continually since 1995 (over 15 years).  (¶ 23) When Bennie associated with a new broker-dealer and his application was submitted to transfer his registration to the new company, onerous and financially devastating restrictions which effectively suspended his registration were imposed for a prolonged and indefinite period of time. Bennie was expressly prohibited from and unable to advertise, solicit new clients, serve any new customers or open new customer accounts, among other things  The Order imposing these restrictions was issued without notice, and Bennie was never provided an opportunity for a hearing.  This action and the events that led to this situation are at the heart of Bennie's Due Process claim. The Amended Complaint alleges that Bennie has a property interest in his registration while the Defendants' Motion asserts he does not.

A property interest is created by state law when an individual has a legitimate claim of entitlement to that interest. *Movers Warehouse, Inc. v. City of Little Canada*, 71 F.3d 716, 718 (8th Cir. 1995). A legitimate claim of entitlement can arise from procedures established in statutes adopted by states. *Littlefield v. City of Afton*, 785 F.2d 596, 600 (8th Cir. 2000). Where a statute effectively imposes substantive limitations on the exercise of official discretion by regulators, the statute gives rise to a property interest. *VanHorn v. Neb. State Racing Comm.*, 304 F.Supp.2d 1151, 1166 (D. Neb. 2004)(citing *Stauch v. City of Columbia Heights*, 212 F.3d 425, 429 (8th Cir. 2000)).

    **A.**    **The Nebraska Securities Act Creates A Protected Property Interest In Bennie's Broker-Dealer Agent And Investment Adviser Representative Registrations Due To The Statutory Provisions For Automatic Approval Of Applications For Registration, The Statutory Requirements Accompanying Any Postponement Of Approval Of A Registration, And The Statutory Findings Required In Order To Deny Registration.**

Under Nebraska law, a broker-dealer agent or an investment adviser representative must be associated with a broker-dealer and/or an investment adviser. When they transfer their affiliation from one firm to another they must notify the Department and request to transfer their registration. Until the registration is approved they cannot legally engage in their occupation. An applicant who requests to transfer his or her registration under the Securities Act has a legitimate claim of entitlement to his timely registration, especially an applicant who has been continuously registered under the Act for the previous fifteen years like Bennie.

The Nebraska Supreme Court has recognized a person's property interest in renewal of a business license. *See Bosselman Inc. v. State*, 230 Neb. 471, 474, 432 N.W.2d 226, 229 (1988) (citing with approval a series of cases holding "that a licensee

has a constitutionally protected interest in obtaining the renewal of a liquor license."). Similarly, under Nebraska law, a broker agent or investment advisor representative, like Bennie, would be found to have a property interest in his registration under the Securities Act.  *See Stauch v. City of Columbia Heights*, 212 F.3d 425, 429 (8th Cir. 2000) ("One manner in which state law can create a property interest is by establishing procedural requirements that impose substantive limitations on the exercise of official discretion."); *Easter House v. Felder*, 910 F.2d 1387, 1407 (7th Cir. 1990) ("statutory and regulatory limitation upon the [regulator's] authority to deny license renewals [to applicants] created such a legitimate claim of entitlement.").

As noted above, under Nebraska's version of the Uniform Securities Act, when a broker agent or investment advisor representative transfers his association from one broker-dealer or investment adviser to another, he must transfer his securities registration with the Department.  Neb. Rev. Stat. § 8-1103(3).  The Securities Act mandates that the Director must act on applications for registration within a specified time period.  Specifically, if no denial order is in effect and no proceeding is initiated under the Act to postpone, suspend, revoke or deny the application, the registration is automatically approved by operation of law after 30 days.  *See* Neb. Rev. Stat. §§ 8-1103(4)(a); 8-1103(9)(a); 8-1103(9)(c)(ii).  Subsection 9 permits the Director to deny, suspend, or revoke a registration "if he or she finds that the order is in the public interest *and* that the applicant or registrant...:  (ii) Has willfully violated or willfully failed to comply with any provision of the Securities Act...[or]; (vii) Has engaged in dishonest or unethical practices in the securities or commodities business...".  Neb. Rev. Stat. § 8-1103(9)(a) (listing twelve bases for denying, suspending or revoking a registration).

Obviously, there may be situations where additional time for investigation by the Department is required prior to making a determination as to whether one of the twelve grounds exists.  Consequently, Neb. Rev. Stat. § 8-1103(9)(c)(ii) provides, "The director may by order *summarily postpone or suspend registration pending final determination* of any proceeding under this subsection." (emphasis added).  This authority, however, is expressly accompanied by due process protections for both an initial applicant and a current registrant. Section 9(c)(ii) requires that "upon the entry of the [summary] order, the director shall promptly notify the applicant or registrant . . . that it has been entered and of the reasons therefore and that within fifteen business days after the receipt of a written request the matter will be set down for hearing."

The Securities Act substantially limits the Director's discretion regarding approval of registration transfer applications by providing automatic approval of the registration after thirty days, by requiring specific findings of fact by the Director prior to suspending, denying, or revoking an application to register, and expressly requiring due process (including notice and a hearing) for any postponement of registration.   For these reasons, Bennie possesses a clear claim of entitlement in his transfer of registration, including timely consideration of his transfer application, and the registration itself due to the mandated findings required before the registration can be denied, suspended, or revoked.  Bennie's claim of entitlement to his registration constitutes a property interest that the U.S. and Nebraska Constitutions protect from infringement.

> **1.    The cases relied upon by the Defendants are clearly distinguishable from the case at hand due to the distinct differences between the underlying regulations and statutes.**

The Defendants' claim that this Court's decision in *Entergy Arkansas, Inc. v. Nebraska,* 161 F.Supp.2d 1001 (D.Neb. 2001) is controlling. The Plaintiff agrees to a

point, as the legal principles and reasoning are clearly applicable. The problem with the Defendants' argument is that they fail to address and analyze the underlying statutes and regulations that were at issue in the *Entergy* case and compare them to those at issue here.  This is a basic requirement of due process analysis. *Id.*  An analysis of the Nebraska Securities Act shows that it is clearly distinguishable from the licensing statutes and regulations at issue in *Entergy*, and utilizing the same analysis as in *Entergy* it is clear that Bennie has a property interest in his registration.

The statutes and regulations at issue in *Entergy* "establish[ed] twelve criteria for issuance of a license." In contrast, the Securities Act establishes just the opposite approach by requiring automatic approval of a registration on the thirtieth day after an application is filed unless the Director affirmatively finds that the applicant has committed one of twelve specified actions.  Compare *Entergy*, 161 F.Supp.2d at 1004 with Neb. Rev. Stat. § 8-1103(9).  Instead of requiring the regulator to find that issuance of the license would be in the public benefit as in *Entergy*, under the Securities Act the applicant is entitled to automatic registration by operation of law unless the Director makes a specific finding that the registration will be contrary to the public interest. Therefore, the Securities Act imposes significant restrictions on the Director's discretion and creates a legitimate claim of entitlement due to its automatic registration approval, its requirement of notice and hearing prior to postponing its decision on an application for registration, and its requirement for specific findings prior to any denial, suspension, or revocation of an application for registration.

Although not raised in the Defendants' Brief, another distinction should be addressed between the statutory scheme here and that examined by this Court in another important due process case involving a state agency.  The Defendants may

attempt to draw an analogy between the Banking Department's authority under § 8-1103(4)(d) to apply conditions to a registration and the State Racing Commission's discretion to issue a temporary license pending the outcome of any licensing investigation as set forth in 294 NAC § 10.005.01.  This Court construed the language in the racing statutes and regulations in *VanHorn v. Nebraska State Racing Comm'n*, 304 F.Supp.2d 1151, 1165-1168 (D. Neb. 2004) and concluded that while an applicant for a license had a property interest in that license, the same applicant did not have a legitimate claim of entitlement to a temporary license because the Racing Commission "had unfettered discretion [under the regulation] regarding the issuance of a temporary license."  It would be erroneous to conclude that *VanHorn's* analysis of the temporary horse racing license is analogous to the Banking Department's ability to place conditions on a securities registration under the Securities Act for several reasons.

Under the Racing Commission regulations a permanent license and a temporary license are two distinct interests.  The Racing Commission's discretion to issue or not issue a temporary license has no substantive impact on the applicant's permanent license.  On the other hand, the Securities Act does not create separate and distinct interests as there is only one registration.  There is no mention or suggestion of, or any provision for, a temporary registration.  In fact, an applicant's registration must be approved within a thirty days of a request unless the director has postponed the registration and provided the application with notice and a hearing.  Neb. Rev. Stat. § 8-1103(4)(a); (9)(c)(ii).  Therefore, the director's authority to restrict or limit a registration directly and affirmatively impacts the applicant's registration, a property interest held by the applicant and protected by due process requirements.

### 2.   Defendants' citation to outdated Nebraska case law does not bear any consideration in the resolution of the case at hand.

The Defendants attempt to draw analogies with other types of licenses, yet none of the cited cases are analogous due to the underlying statutes and regulations. Furthermore, Defendants cite old Nebraska case law using an analytical approach of differentiating privileges and property interests that the Supreme Court of Nebraska has expressly rejected.   The Nebraska Supreme Court has stated that the Defendants' mode of analysis is "no longer useful for the purpose of determining whether procedural due process protections apply to the interest." *Bosselman, Inc. v. Nebraska and Neb. Liquor Control Comm'n*, 230 Neb. 471, 474, 432 N.W.2d 226, 229 (1988).

The Defendants assert that "Nebraska courts have held that a party has no property interest in a license issued by a regulatory agency of the State."  (Brief in Support at 16.)  To support this statement, the Defendants cite four separate cases dating from 1981 and earlier that describe a license to sell liquor as "a purely personal privilege," a license to operate a radio station as "a permissive grant of a privilege," and, a license to drive an automobile as "a privilege and not a property right." *Id.* (internal citations and quotations omitted).   However, under current Nebraska case law the citation to these old cases is misleading.   As noted above, the Nebraska Supreme Court, citing U.S. Supreme Court precedent, expressly rejected the reasoning and analysis that characterizes these interests as merely a privilege unprotected by due process, and by extension rejected each of the cases cited by the Defendants. *Id.* More recent cases involving the type of licenses at issue in the Defendants' cited cases demonstrate that both Nebraska and federal courts have found that citizens have important and protected property interests in these licenses. *See Murray v. Neth*, 279

Neb. 947, 955, 783 N.W.2d 424, 432 (2010)(stating "[s]uspension of issued motor vehicle operators' licenses involves state action that adjudicated important property interests of the licensees.   Thus, the property interest involved here is [Plaintiff's] interest in retaining his driving privileges."); 230 Neb. at 475, 432 N.W.2d at 229 (stating, "a licensee has a constitutionally protected interest in obtaining the renewal of a liquor license.").

Upon review of current Nebraska law, which analyzes property rights using the same methods as federal courts, it is clear that the Securities Act confers a legitimate claim of entitlement upon applicants for transfer of their registration; claims of entitlement that are protected from arbitrary actions through due process protections.

**B.      The Director Is Not Empowered To Impair An Applicant's Registration Through Postponement, Suspension, Or Revocation Of That Registration Without Adherence To The Securities Act's Due Process Requirements.**

In an attempt to avoid the clear Nebraska and federal case law establishing that a licensee such as Mr. Bennie has a protected property interest in his registration, the Defendants attempt to draw a distinction between Bennie's property interest in the approval of the registration and the Director's "conditioning" of his registration, which the Defendants contend the Director has unfettered discretion to do.   The Defendants' claimed distinction attempts to read a single sentence in the Securities Act in isolation, and ignores the entire remainder of the statute along with the clear legislative intent. The attempted distinction also ignores the actual impact such authority would have on securities registrations in general, and in particular rendering Bennie's registration nearly valueless.

     **1.**    **Defendants' reliance on § 8-1103(4)(d) is misplaced and ignores other obligatory provisions within the Securities Act as well as the impact such a reading of the statute would have on registration.**

Instead of construing the entirety of the Securities Act and the Nebraska Legislature's attempt to strike a balance between its registration requirements and broker agents/investment advisor representatives' interest in timely and accurate processing determinations regarding applications, the Defendants attempt to cabin their actions entirely within a single subsection of the Act.  This reliance on an isolated subsection ignores several other applicable provisions within the Securities Act, and importantly the very structure of the Act itself.  This provision does not negate the due process protections and requirement for notice and a hearing that are expressly required when a registration is postponed or suspended pending a determination of whether a violation of the Act has occurred.

Defendants assert that "Nebraska law clearly allows the Department to approve a registration with conditions *without first holding a hearing*," and cite Neb. Rev. Stat. 8-1103(4)(d) as the lone support for their contention.  (Brief in Support at 13).  The entirety of 8-1103(4)(d) actually reads, "The director may restrict or limit an applicant as to any function or activity in this state for which registration is required under the Securities Act of Nebraska."  Yet, nowhere in the Securities Act does it state that the Director may condition a registration "without first holding a hearing."  While the Defendants would prefer the phrase "without first holding a hearing" were included in the provision, a proper reading of the entire statute makes it clear that the Securities Act requires notice and an opportunity for a hearing before the Director exercises his

authority under 8-1103(4)(d) to condition a registration, especially when such conditions essentially eviscerate the value of the registration itself.

To read this provision in isolation from the rest of the Act would render a nonsensical and unconstitutional result.  It would be nonsensical because the detailed procedures for notice and a hearing pending a determination of a violation would become meaningless and superfluous.  The Defendants' selective reading of the Act is also inconsistent with the overall statutory scheme. Under the Securities Act the Director literally cannot even impose a $10 fine on a registrant without affording them notice and an opportunity for a hearing. Neb. Rev. Stat. § 8-1108.01(4).  Yet, the Defendants claim in their Brief that the Act gives them unfettered discretion to be able to effectively shut down an established business by indefinitely prohibiting all advertising and all solicitation of or service to any new clients.  Such a reading of the statute would afford due process to some and not other applicants. It would also allow evasion of the hearing requirements simply by characterizing the suspension or postponement of a registration as, for example, a partial or conditional approval where the applicant was ordered to cease all activities except one (which is essentially what happened here). It would render an unconstitutional result because the Director could arbitrarily and summarily deprive a person of his or her livelihood without due process.  Furthermore, as will be shown below, Defendants' suggested interpretation of the statute would render its decisions regarding "conditions," no matter when or how they were applied or who they were applied to, completely unreviewable.  *See infra* § III below.

Taken to its logical conclusion, Defendants' proposed reading of the isolated subsection would allow the Director to issue a "conditional" order under § 8-1103(4)(d) that stated, "Applicant's registration is approved subject to the condition that he not sell

securities within Nebraska."  Clearly, such a reading of the statute is plainly contrary to Securities Act itself, and is nothing more than an attempt to avoid review of their deprivation of Bennie's constitutional rights by placing the label "conditional approval " on a suspension  order.  This ignores the actual substance of the order.  Additionally, the "conditional approval" order at issue here that forbade Bennie from advertising his services, soliciting new customers, opening new customer accounts and supervising other broker agents or investment advisor representatives, without question "affected" Bennie's rights and rendered the so-called 'approval' effectively meaningless in terms of his ability to enjoy the rights of the registration through maintaining or growing his business, which depended entirely on his registration.  *See JCB Enterprises, Inc. v. Nebraska Liquor Control Comm'n*, 275 Neb. 797, 806, 749 N.W.2d 873, 881 (2008) (stating that, "The central meaning of procedural due process is that parties whose rights are to be *affected* are entitled to be heard, and, in order that they may enjoy that right, they must first be notified.")(emphasis added).

> **2.    Defendants' concession that the conditions on Bennie's registration were meant to give them additional time to examine allegations against Bennie demonstrates their attempt to evade Bennie's due process rights and to arbitrarily deny him the full enjoyment of his property rights.**

While referencing Neb. Rev. Stat. § 8-1103(4)(d), the Defendants concede that "[T]he Director exercised this statutory discretion by placing conditions on Bennie's registration *pending* the Department's investigation of *allegations* made by Bennie's former employer, LPL, that Bennie engaged in inappropriate conduct.  (Brief in Support at 13) (emphasis added).  This statement clearly demonstrates the Defendants' utter disregard for the statute and specifically to the due process requirements therein.

As conceded by Defendants, they desired additional time to consider Bennie's registration beyond the thirty days provided by the statute before automatic registration would take effect.  However, nothing in the Order that was issued even suggests the conditions were only temporary, or were subject to additional consideration by the Director.  Despite the fact that the Securities Act provides a clear procedure for just such a situation, the Director, as a result of the actions of the Defendants, chose to indefinitely postpone or suspend Bennie's registration by grasping onto a single provision of the Securities Act and taking it out of context of the statutory scheme and ignoring the remaining provisions of the Act -- and to do so with no notice or hearing.

If the Defendants had genuinely desired nothing more than time to investigate the facts underlying the U5 filing by LPL then they could have relied on section 9(c)(ii) to "summarily postpone. . . registration pending final determination. . .". Yet, the Court can reasonably infer from the allegations of the Amended Complaint that the Defendants refused to utilize 9(c)(ii)'s postponement of registration because the section requires prompt notification to the applicant of postponement, the "reasons therefor and that within fifteen days after the receipt of a written request [that] the matter will be set down for hearing." Neb. Rev. Stat. § 8-1103(9)(c)(ii).

This inference is further supported by considering the substance of the Orders in conjunction with the allegations supposedly supporting those Orders.  The Defendants now contend that the Orders were meant as temporary measures (although no such indication is anywhere on the Orders) to allow them to investigate LPL's allegations of Bennie's "violation[s] of internal firm policies and procedures" related to then current client signatures.  (¶ 97).  Yet, the Orders prohibited Bennie from accepting any new clients or any advertising, neither of which are rationally related to LPL's allegations, but

are clearly related to Defendants' earlier harassing actions concerning Bennie's political speech and public communications.   Furthermore, the Orders were issued after the Defendants had received independent audit results indicating Bennie had not violated any of LPL's internal policies or procedures.  (¶ 99).  It is reasonable to infer that the Orders are actually related to the "reserve file" Defendants kept just waiting for Bennie to "eventually hang himself."  (¶ 91).  The Orders were not issued to protect the public, as required by the Securities Act, but rather to punish Bennie for his advertising and public communications.

Ultimately, due to the Defendants' desire to harm and retaliate against Bennie for his political views, the Defendants chose to disregard the required time limits the statute placed on their examination of the registration by claiming to "approve" Bennie's registration with "conditions" and thereby allow them to investigate and examine Bennie indefinitely without ever affording him the right to notice or a hearing while he lost twenty-five million ($25,000,000.00) in assets under management due to the "approval." (¶ 112) Simply put, the Defendants wanted to operate unconstrained by the Securities Act or Bennie's due process rights.

It is also noteworthy that the Defendants suggest they were investigating Bennie for LPL's allegations that he had engaged in inappropriate conduct.[1] Although a finding of dishonesty or unethical conduct in the securities business is one of the specified findings required to deny, suspend, or revoke a registration, the Defendants simultaneously and inconsistently contend that this section of the Act is inapplicable.

---

[1] The term "suggest" is used because Bennie was never provided notice of the allegations against him that led to the Defendants' investigation and issuance of the Orders.  Bennie is left to infer from the Defendants' brief in support of their motion to dismiss that it was the LPL entries on a U-5 form that prompted the Orders.  It should be noted there is no allegation or contention by the Department that Bennie actually violated the Act, even after months of investigation and an on-site records

Neb. Rev. Stat. § 8-1103(9)(a)(vii).  It is clear that under the Securities Act once the Director begins to examine whether an applicant has done one of the specified prohibited acts, a "proceeding" under subsection 9 has begun.  Here, the Defendants concede that they were proceeding to examine whether Bennie's registration should be denied for a violation of the Act.  Therefore, the introductory prerequisite phrase in § (a) "if . . . no proceeding is pending under subsection (9) of this section" clearly shows that the Defendants' actions were not authorized by § 4(d).  The Amended Complaint sets forth facts, taken from internal Department e-mails, from which the Court can reasonably infer the Defendants' intentionally manipulated the content of the Order to deny Benny notice and a hearing as well as avoiding the automatic registration provision.

### C.     The Defendants' Issuance And Participation In The Issuance Of The Stigmatizing Orders Damaged Bennie's Professional Reputation And Stripped Him Of Rights Previously Held As A Registered Broker-Agent And Investment Adviser Representative.

In order to assert a due process claim for harm to one's reputation, Bennie must allege that "the government issue[d] a stigmatizing posting (or designation) as a result of which the stigmatized individual is deprived of a right previously held under state law due process is required." *National Council of Resistance of Iran v. Department of State*, 251 F.3d 192, 204 (D.C. Cir. 2001) (*citing Paul v. Davis*, 424 U.S. 693, 708, 96 S.Ct. 1155 (1976) (internal quotations omitted).  In *Wisconsin v. Constantineau*, the U.S. Supreme Court stated that "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.  400 U.S. 433, 437, 91 S.Ct. 507 (1971).  In that

---

inspection/audit.  The Amended Complaint details the clearance of Bennie by an independent audit as well as by the Department.

case, a city's chief of police had, without notice or hearing, posted a notice in all liquor stores that the plaintiff was forbidden for one year from purchasing liquor there from. *Id.* at 435. The court described the government official's posting as not only denying the plaintiff his ability to purchase liquor, but also that the government official was "giving notice to the public that he has found the particular individual's behavior to fall within one of the categories enumerated in the statutes." *Id.* at 436. The court concluded that "procedural due process requires that before one acting pursuant to State statute can make such a quasi-judicial determination, the individual involved must be given notice of the intent to post and an opportunity to present his side of the matter." *Id.* (internal citation omitted). Later, the U.S. Supreme Court emphasized that *Constantineau* stands for the proposition that when government action or "posting" significantly alters a citizens "legal status which, combined with the injury resulting from the defamation" justifies the invocation of procedural due process. *Paul*, 424 U.S. at 708-09, 96 S.Ct. at 1164; *See also Green v. DeCamp*, 612 F.2d 368, 370 (8th Cir. 1980) (stating "the posting of the plaintiff's name in *Constantineau* involved a deprivation of a property interest protected by the fourteenth amendment, because it deprived the individual of a right previously held under state law the right to purchase or obtain liquor.")).

The government official's actions in *Constantineau* are analogous to the actions of Munn, Herstein, Griess, and Walter in this case. Prior to the posting of the December Order, Bennie enjoyed his registration as a broker-agent and investment advisor representative in Nebraska and was able to advertise his services to the public, seek engagement from new clients, and to supervise other broker-agents and investment advisor representatives in his office. Yet, after the posting of the December Order, Bennie's legal rights in these regards were significantly altered; in fact, these rights were

stripped from him.   Additionally, and just as devastating to Bennie, is the public's perception of the meaning of those orders.   Like the *Constantineau* posting, the December Order notified the public that Munn and the other officials within the Department had found that Bennie's actions fell into one of the enumerated categories within the Securities Act, which includes "engaging in dishonest or unethical practices in the securities or commodities business." Neb. Rev. Stat. § 8-1103(9)(a)(vii).   In fact, the posting of the Order resulted in denial of Bennie's securities registration in numerous other states and the refusal of large insurance companies to continue to do business with him. (¶¶ 109, 110)  Despite the clear implications of the December Order, issued by Munn in conjunction with Herstein's, Griess', and Walter's recommendation and participation, none of the government officials gave Bennie notice of their intent to post the order or an opportunity to present his side of the matter.   Instead, the Defendant's simply issued the defamatory order and made it available to the public resulting in significant altering of Bennie's legal rights previously held, and substantial harm to his reputation.

In an attempt to counter this clearly analogous case law, Defendants cite several cases holding that "injury to reputation *by itself* does not state a constitutional deprivation."   (Brief in Support at 17) (emphasis added).   Yet, as described above, Bennie does not allege that the Defendants only harmed his reputation.   The Amended Complaint, when read in its entirety, clearly alleges that Bennie was "stigmatized in connection with a denial of a right or status previously held under state law."   *Mangan v. Cullen*, 870 F.2d 1396, 1399 (8th Cir. 1989).   The Defendants' actions in issuing the Orders stigmatized Bennie's reputation and at the same time denied him the status of a

fully registered broker-agent and investment adviser representative and stripped him of important rights he had due to that status.

### D. The Defendants' Actions Unreasonably Interfered With And Effectively Destroyed Bennie's Right to Pursue His Chosen Profession During the Period at Issue.

"It requires no argument to show that the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the Fourteenth Amendment to secure." *VanHorn*, 545 F.Supp.2d at 1168. Furthermore, the "Constitution only protects the liberty to follow a chosen profession *free from unreasonable governmental interference* from state actions that threaten to deprive persons of the right to pursue their chosen occupation." *Habhab v. Hon*, 536 F.3d 963, 968 (8th Cir. 2008) (internal punctuation and citation omitted)(emphasis added).

While the Defendants correctly note that "state actions that exclude a person from one particular job are not actionable," they again misconstrue the allegations of the Amended Complaint by going further in claiming that Bennie had no protected liberty interest in his occupation and vocation. The basis of Bennie's complaint is not that the Defendants' actions merely resulted in him losing his position with LPL, it is that the Defendants' actions unreasonably interfered with his right to pursue his chosen profession.

The Defendants attempt to disregard the actual effect of the Orders on Bennie's pursuit of his occupation by claiming the Defendants "allow[ed] him to continue advising current clients." (Brief in Support at 19) Yet, the Defendants' actions barred Bennie from all advertising or even accepting new clients. It can hardly be argued that after the Defendants' actions Bennie remained free to pursue his chosen profession if he could

not sustain his business by replacing clients who no longer required his services with new clients, much less growing his business. The allegations of the Amended Complaint clearly demonstrate that the Defendants' actions unreasonably interfered with Bennie's right to pursue his chosen profession and severely limited, if not destroyed, his professional opportunities during the effective period of the Orders. Thus, Bennie has a liberty interest protected by the state and federal law.

### III.   BENNIE HAD NO ABILITY TO DEMAND A HEARING ON THE ORDERS, AND HE EXHAUSTED ALL REMEDIES AVAILABLE TO HIM.

In their motion to dismiss, Defendants erroneously claim that Bennie's due process claims fail to state a claim because Bennie did not request a hearing once the Director issued the Orders. Defendants assert that Bennie could have requested a hearing under Neb. Rev. Stat. § 8-1119 or 49 N.A.C. § 5.003.02. As shown below, no such remedy was available to Bennie, and he was left with no administrative mechanism by which to demand Defendants and the Department provide him the due process required by law.

Neb. Rev. Stat. § 8-1119 provides: "Any person aggrieved by a final order of the director may appeal the order, and the appeal shall be in accordance with the Administrative Procedure Act." However, as the Defendants well know, under the Administrative Procedures Act ("APA"), Bennie may only appeal where there has been a "contested case," which is defined as "a proceeding before an agency in which the legal rights, duties, or privileges of specific parties are required by law or constitutional right to be determined *after an agency hearing*." Neb. Rev. Stat. § 84-901(3) (emphasis added). "Any person aggrieved by a final decision in a contested case, whether such decision is affirmative or negative in form, shall be entitled to judicial review under the

[APA]."  Neb. Rev. Stat. § 84-917.  Absent a contested case, which requires a hearing, no appeal is authorized under the APA.  *See Stoneman v. United Nebraska Bank*, 254 Neb. 477, 483-84, 577 N.W.2d 271, 277 (1998) (stating that the district court lacks jurisdiction to grant judicial review of an agency determination unless the case was "contested."); *Central Park Pharm. v. Nebraska Liquor Control Comm'n.*, 216 Neb. 676, 678, 344 N.W.2d 918, 920 (1984) ("[A] proceeding becomes contested when a hearing is required.").  Defendants' argument that an appeal was available to Bennie under the APA must be rejected for the same reason that Bennie now has a valid due process claim—because no hearing was provided to Bennie on the Orders.  The fact that Defendants argue that an appeal was (or should have been) available to Bennie further demonstrates that opportunity for a hearing should have been provided.

It should also be noted that the Orders were not in the form required by the APA.

The APA states:

> Every decision and order adverse to a party to the proceeding, rendered by an agency in a contested case, shall be in writing or stated in the record and shall be accompanied by findings of fact and conclusions of law. The findings of fact shall consist of a concise statement of the conclusions upon each contested issue of fact. Parties to the proceeding shall be notified of the decision and order in person or by mail. A copy of the decision and order and accompanying findings and conclusions shall be delivered or mailed upon request to each party or his or her attorney of record.

Neb. Rev. Stat. § 84-915.  The December and February Orders had no findings of fact or conclusions of law, and provide no basis to support the conditions imposed.  Thus, even if a hearing had been provided, any right to an appeal would have been effectively undercut by the scant and deficient nature of the Orders.  Properly designating errors on appeal is not possible where the Department provided no findings of fact, no

conclusions of law, and no basis for the conditions. The Defendants' argument that an appeal was available under the APA is specious if not frivolous.

Next, the regulations cited by Defendants, 49 N.A.C. §§ 5.003.02, 5.003.03A, are wholly inapplicable in this case, and provided Bennie with no right to a hearing. 49 N.A.C. § 5.003.02 reads: "Any person may petition the Department for the issuance of a declaratory order as to the applicability of a specific statute, rule, or order within the primary jurisdiction of the Department to the person's specific circumstances." This regulation is intended to provide the opportunity to obtain clarity regarding the applicability of a statute, rule, or order. The rule provides for what amount to advisory opinions to assist people in navigating statutes, rules and past orders administered by the Department so they may govern themselves accordingly. It does not provide administrative or judicial review of the propriety of an order directed at the requester. The regulations themselves specifically state that a declaratory order may not be used as an appeal mechanism. 49 N.A.C. § 3.003.03C states: "A declaratory order is not a mechanism for review or appeal of a decision made by the Department in a contested case."

Again, the Defendants' argument is shown to be nonsensical, if not frivolous, by the plain terms of the law. The question in Bennie's case was not whether the December and February Orders applied to him (it was abundantly clear that they did), but why and whether the orders should have been entered in the first place. The declaratory order mechanism cited by Defendants is not an appeal process, and provided no opportunity for due process to Bennie. Furthermore, Defendants' argument also fails because even if a petition for a declaratory order is filed, the regulations do not require a hearing to be held. *See* N.A.C. § 5.005 *et seq.* Thus, at no time was Bennie

able to force Defendants to provide the due process the law requires.   As the Defendants themselves point out in their brief (Brief in Support at 20) due process requires opportunity to be heard "at a meaningful time and in a meaningful manner." *Marler v. Missouri State Board of Optometry*, 102 F.3d 1453, 1456 (8th Cir. 1996). Neither an APA appeal or a declaratory order, even if they were available (which they were not) would provide a hearing in a meaningful time or manner.

Defendants' argument that Bennie's due process claims fail to state a claim because Bennie did not request a hearing once the Department issued the Orders relies upon misapplication of statutes and regulations, and ignores the fundamental fact of this case, which is that Bennie was never provided notice or any opportunity for a hearing and he had no administrative remedy available to force the Defendants' hand. Defendants' argument is contrary to the clear terms of the statute and regulation cited by the Defendants and should be wholly rejected.

## IV.   BOB BENNIE WEALTH MANAGEMENT SUFFERED DAMAGES DUE TO THE ACTIONS OF THE DEFENDANTS.

The Defendants argue that all claims in the Amended Complaint should be dismissed as to Bob Bennie Wealth Management ("BBWM").   BBWM is the name of the Plaintiff's business and the Amended Complaint was brought by Mr. Bennie "individually and on behalf of Bob Bennie Wealth Management."   It is true that the Nebraska Securities Act provides for registration of individual broker-deal agents and investment advisor representatives and not their businesses. However, the harm caused to Mr. Bennie individually by the Defendants' actions and to his business is inextricably intertwined.   In the Amended Complaint it is alleged that Mr. Bennie operates his business under the name Bob Bennie Wealth Management. (¶ 21)   All advertising of

his services to the public is done under this name.  When Mr. Bennie was prohibited by the Defendants from advertising or soliciting any new clients, Bob Bennie Wealth Management was likewise restricted and all new business ceased.  The Defendants should not be allowed to maneuver into a position where they may later claim the damages that resulted from their conduct were incurred by Bob Bennie Wealth Management and not by Mr. Bennie.

## CONCLUSION

For all the foregoing reasons, Defendants' Motion to Dismiss is without merit and should be overruled in its entirety.

Dated this 21st day of October, 2011.

> Respectfully submitted,
>
> ROBERT R. BENNIE, JR., individually, and on behalf of BOB BENNIE WEALTH MANAGEMENT, INC., Plaintiffs
>
>
> By:  /s/ Steve Grasz
> Steve Grasz (#19050)
> David M. Newman (#24549)
> HUSCH BLACKWELL LLP
> 1620 Dodge Street, Suite 2100
> Omaha, NE  68102
> Telephone:  (402) 964-5000
> Facsimile:  (402) 964-5050
> steve.grasz@huschblackwell.com
> dave.newman@huschblackwell.com
>
> *Attorneys for Plaintiff*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 21st day of October, 2011, I electronically filed the

above and foregoing with the Clerk of the Court using the CM/ECF system which sent

notification of such filing to the following:

Mark C. Laughlin          mlaughlin@fraserstryker.com
Timothy J. Thalken        tthalken@fraserstryker.com


_____/s/ Steve Grasz_____