IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| ROBERT R. BENNIE, JR., individually, and on behalf of BOB BENNIE WEALTH MANAGEMENT, INC., | ) ) ) ) | CASE NO.  4:11CV3089 |
| Plaintiff, | ) ) | |
| vs. | ) ) ) | **DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT** |
| JOHN MUNN, in his official and individual capacity, JACK E. HERSTEIN, in his official and individual capacity, RODNEY R. GRIESS, in his official and individual capacity, and JACKIE L. WALTER, in her official and individual capacity., | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**INTRODUCTION**

Bennie argues that Defendants collectively discriminated against him.  Rather than allege facts establishing the personal involvement of each Defendant, Bennie attempts to lump all Defendants together.  Because Bennie lacks facts showing the personal involvement of each Defendant, he asks the Court to make inferences regarding each Defendant's personal involvement.  As discussed in detail in this brief, these inferences are not reasonable.  Bennie also seeks to hold each Defendant liable for the actions allegedly taken by other Defendants because of the position each Defendant held in the Department.  However, Bennie has failed to allege sufficient facts to impose supervisory liability under Section 1983.

1

Bennie continues to confuse approving a registration with conditions, with a denial or suspension of a registration.  Nebraska law is clear that no hearing is required when conditions are placed on a registration.  As such, Bennie's due process claims should be dismissed.  Bennie has no property or liberty rights in an unconditional registration or his reputation, and was not completely deprived of his right to pursue his profession.  Bennie's due process claims fail to state a claim because he failed to exhaust his administrative remedies by requesting a hearing.  Bennie lacks standing to assert claims on behalf of a corporation.

## I.   BENNIE FAILS TO ALLEGE SUFFICIENT FACTS ESTABLISHING EACH DEFENDANT'S PERSONAL INVOLVEMENT IN A SCHEME TO DISCRIMINATE AGAINST BENNIE.

Bennie agrees that in order to state a claim under Section 1983, he must allege facts supporting each individual Defendant's personal involvement in the constitutional violation.  (Bennie Brief at 2) (citing Ellis v. Norris, 179 F.3d 1078, 1079 (8th Cir.1999)).  Bennie attempts to evade this obligation by arguing that Walter, Herstein, Griess, and Munn engaged in "a coordinated and deliberate scheme of harassment…using their official positions and authority to punish and discredit a private citizen under their regulatory control and damage his business based on his political views, public statements and the exercise of his constitutional rights."  (Bennie Brief at 63).  Thus, Bennie argues that each Defendant is liable for the acts allegedly taken by other Defendants.

Arguing that Defendants engaged in a conspiracy to retaliate against Bennie for exercising his constitutional rights does not relieve Bennie of his requirement to allege specific facts regarding the personal involvement of each individual Defendant. Conspiracy allegations must also contain "sufficient specificity and factual support to suggest a 'meeting of the minds.'" Deck v. Leftridge, 771 F.2d 1168, 1170 (8th Cir. 1985). The Amended Complaint fails to meet this standard.  In his Amended Complaint, Bennie refers to specific acts taken by individual Defendants.  He never alleges facts suggesting that there was a meeting of the minds by Defendants to retaliate against Bennie because Bennie exercised his constitutional rights.

Bennie then attempts to hold one defendant liable for the acts allegedly taken by others because of the alleged conspiracy.   Bennie's allegations that "Defendants" collectively engaged in certain actions is not sufficient to state a claim.  See Robbins v. Oklahoma, 519 F.3d 1242, 1249-50 (10th Cir. 2008) citing Twombly, 127 S.Ct. at 1970-71 n. 10 (Alleging generally that "defendants" collectively acted without identifying which acts are attributable to whom makes it "impossible for any of these individuals to ascertain what particular unconstitutional acts they are alleged to have committed.").

### A. Bennie's Allegations Against Walter Do Not State a Section 1983 Claim.

The Amended Complaint alleges two specific acts in which Walter was involved. First, on January 15, 2010, Walter received an e-mail from Griess, internal to the Department, regarding Griess's intent to fine Bennie.  (Am. Compl. ¶ 51).  The

3

Department never fined Bennie.  This communication between two employees of the Department cannot be a source of liability against Walter.

Second, sometime between December of 2010 and April of 2011, Walter contacted Bennie's new broker-dealer, Prospera, a regulated entity, requiring Prospera to respond to questions and inquiries and requiring that Prospera provide her with detailed documentation proving Bennie had not opened any new accounts since the December Order. (Am. Compl. ¶¶ 119 & 121).  These requests occurred *after* LPL terminated its relationship with Bennie, were not directed to LPL, and could not have contributed to LPL's decision to terminate Bennie on November 2, 2010--over a month prior.  (Am. Compl. ¶ 94).  Moreover, Bennie does not allege that in response to Walter's inquiries, Prospera took any actions against Bennie that caused him harm.  Thus, these alleged actions cannot be the source of liability against Walter.

Recognizing that neither of these specific actions are sufficient to state a claim against Walter, Bennie argues that it is "reasonable to infer" that Walter was involved in a conspiracy to discriminate against Bennie, and liable for actions allegedly taken by other members of the Department.  For example, Bennie alleges that because Walter received an e-mail from Griess stating that Griess had proposed fining Bennie, it is "reasonable to infer" that Walter was "personally involved in the scheme aimed at Mr. Bennie and was fully aware of what was taking place." (Bennie Brief at 24).  It does not reasonably follow that because Griess informed Walter that he was proposing a fine

(which never was issued), that Walter was involved in a conspiracy to retaliate against Bennie for exercising his constitutional rights.  There are no factual allegations that Walter even knew that Bennie had exercised his constitutional rights.

Bennie also seeks to hold Walter liable based solely on the fact that she was employed as a securities examiner with the Department.  For example, Bennie alleges that in November 2009, a year before Bennie was terminated by LPL, an "unknown securities analyst" obtained a DVD Bennie distributed to clients.  (Am. Compl. ¶ 34).  Bennie *argues* that given Walter's position and duties, it is "reasonable to infer" Walter was the analyst or was personally involved in reviewing the DVD.  (Bennie Brief at 24).  Considering that Bennie *alleged* that the person who reviewed the DVD is "unknown" no such inference is warranted.  Regardless, the fact that a DVD was internally reviewed by the Department could not be the basis of liability against Defendants generally, or Walter in particular.  There is no allegation that the Department took any action against Bennie relating to this DVD.

In order to state a claim against Walter, Bennie must allege specific facts supporting Walter's personal involvement in the alleged constitutional violation.  <u>See</u> <u>Ellis</u>, <u>supra</u>.  As discussed above, Bennie's Amended Complaint fails to meet this burden.  Alleging a conspiracy does not cure the defects in Bennie's Amended Complaint because the facts of a conspiracy must also be alleged with specificity.  <u>See</u> <u>Deck</u>, <u>supra</u>.  Bennie's claim against Walter should be dismissed.

**B.**    **Bennie's Allegations Against Herstein Do Not State a Section 1983 Claim.**

Bennie repeatedly argues that "it is reasonable to assume" that actions allegedly taken by other employees in the Department were done "under the supervision of Herstein" and that the Department was "[headed by Munn and Herstein]" and that it was "Herstein's Securities Bureau." (Bennie Brief at 6, 9, 12, 13, 15 etc.). Alleging that Herstein had a supervisory position in the Department is not sufficient to state a claim. "A supervisor cannot be held liable, on a theory of respondeat superior, for an employee's unconstitutional actions." Boyd v. Knox, 47 F.3d 966, 968 (8th Cir. 1995). "[F]or a supervisor to be held liable for the acts of a subordinate, something more must be shown than merely the existence of the supervisor-subordinate relationship." Clay v. Conlee, 815 F.2d 1164, 1170 (8th Cir.1987). "The supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what [he] might see." Ripson v. Alles, 21 F.3d 805, 809 (8th Cir. 1994) (internal quotation omitted).

Summarized, the specific allegations against Herstein are that before March 10, 2010, he engaged in internal Department discussions with other employees in the Department regarding fining Bennie. The Department never fined Bennie. As of March 10, 2010, Herstein recommended that the Department take no regulatory action against Bennie. (Am. Compl. ¶ 92).

The next specific allegation relating to Herstein occurred on October 4, 2010, almost seven months later, when an article entitled "Tea Party: Reduce State Spending"

6

was allegedly placed in the Department's files.  (Bennie Brief at 15).  Without factual support, Bennie argues that it is reasonable to infer that the article was placed in the Department's file under Herstein's supervision.  Id.  No such inference is warranted.

Bennie further asserts that on November 2, 2010, LPL terminated its relationship with Bennie and that "upon information and belief" the termination was due to "continued pressure and harassment from Herstein."  (Bennie Brief at 15).  Considering that Bennie does not allege any facts suggesting that Herstein, or anyone else in the Department had any contact with LPL for almost eight months before Bennie's termination, Plaintiff's allegation that LPL terminated Bennie because of Herstein's "continued pressure and harassment" is completely unwarranted and without factual support.

The next factual allegations regarding Herstein relate to the transfer of Bennie's registration to Prospera.  According to Bennie, Herstein wrote "I don't see why this [Bennie's application for registration] would be treated any different than any other applicant applying for a license."  (Bennie Brief at 17).  This is hardly a fact supporting an inference that Herstein approved or directed that the Department discriminate against Bennie due to Bennie's exercise of his constitutional rights.

On December 17, 2010, the Department issued an Order approving Bennie's registration with conditions.  Munn, the Department's Director, signed the Order. Without factual support, Bennie argues that "it is a reasonable inference this order was

drafted and issued under the direct supervision of Herstein and quite possibly Herstein himself." (Bennie Brief at 17-18). No such inference is warranted.

Bennie then argues that the Order was distributed via the Department's website which was "under the direct control of Herstein." (Bennie Brief at 18 & 21). Again, there are no facts from which one could infer that Herstein controlled the Department's website. Bennie further argues that the Department did not conduct an on-site inspection of Bennie's files until March 9, 2011 and that it is a reasonable inference that this "delay was approved by Herstein." (Bennie Brief at 19). There are no facts supporting such an inference.

Bennie argues that after the conditions on Bennie's registration were removed, "Defendants persisted with harassing inquiries and numerous demands for records [to Bennie's new broker, Prospera]." (Bennie Brief at 20). Bennie concludes that "it is a reasonable inference this activity persisted under the direct supervision of the head of the Securities Bureau, Mr. Herstein." (Bennie Brief at 20). No such inference is warranted. Regardless, Bennie does not allege that he was injured in any way by the Department requesting records from Prospera.

All told, Bennie's allegations do not support an inference that Herstein "embarked on a concerted scheme of harassment aimed at Mr. Bennie because of his political views…" (Bennie Brief at 5). None of the facts show that Herstein personally discriminated against Bennie. There are no factual allegations that Herstein, in his

supervisory capacity, approved, facilitated, or condoned any discriminatory actions allegedly engaged in by others.  To the contrary, the facts alleged by Bennie show that Herstein decided not to fine Bennie in March 2010 and that Bennie's application for registration should be treated like any other applicant's.  Bennie's failure to allege specific facts showing that Herstein was personally involved in discriminating against Bennie because he exercised his constitutional rights is fatal to Bennie's claim against Herstein.

### C.    Bennie's Claims Against Munn Unrelated To The Orders, Do Not State a Section 1983 Claim.

Like his allegations against Herstein, Bennie attempts to hold Munn liable for actions allegedly taken by employees of the Department solely by virtue of Munn's position as Director of the Department.  Defendants do not dispute that Munn signed the Orders which Bennie argues were issued for a discriminatory purpose.  However, Bennie's remaining allegations against Munn do not allege facts establishing that Munn knew of the alleged scheme to discriminate against Bennie, and facilitated, approved, or condoned it.  Like his allegations against Herstein, Bennie's allegations against Munn are based on "reasonable inferences" which, when examined, are not reasonable at all.

Bennie's timeline of "facts" regarding Munn again begins in the Fall of 2009. (Bennie Brief at 28).  Bennie argues that after Bennie aired a television advertisement, the "Defendants, including Munn, embarked on a concerted scheme of harassment aimed at Mr. Bennie because of his political views described below."  Id.  However,

Bennie alleges no facts that Munn was aware that Bennie had aired the television ad or expressed political views when the Department began investigating Bennie's advertisements or that Munn was aware of or authorized the investigation at the time. Based on the factual allegations in the Amended Complaint, the first time Munn was aware that there was an investigation regarding Bennie was on February 25, 2010, when Munn sent an e-mail to Herstein notifying him that the Governor called Bennie. (Am. Compl. ¶ 83).

Second, Bennie argues that in January, 2010, "Defendants" discussed fining Bennie at Department meetings.  (Bennie Brief at 29) (Am. Compl. ¶¶ 49-51).  Bennie does not allege facts suggesting that Munn was present at the meetings or knew what was discussed.  Rather, Bennie argues "it is reasonable to infer these proposed fines were discussed with or were made under the supervision of Munn."  Id.  No such inference is warranted by the facts pled.  Regardless, the Department did not fine Bennie, so no harm could have come from these internal discussions.

Next, Bennie argues that in February 2010, Munn received a dinner invitation from Bennie, and Munn forwarded it on to Griess to determine if the disclosures on the invitation were in compliance with law.  (Bennie Brief at 29).  Bennie argues, without any factual support, that it is reasonable to infer that "Munn was acting outside of the normal procedure for initiation of complaints against a broker-dealer related to advertising."  No such inference is warranted.

On February 25, 2010, Munn wrote a memorandum to the Governor explaining the Department's investigation into whether Bennie had complied with disclosure requirements in his advertisements and that the Department was waiting for LPL's response. (Am. Compl. ¶ 84). Bennie argues that Munn's statements to the Governor were untrue and "It is reasonable to infer from these factual allegations that Munn was making misrepresentations to the Governor and/or covering up the scheme then underway against Bennie." (Bennie Brief at 32). Considering that LPL did not respond to the Department's inquiries until February 26, 2010 (Am. Compl. ¶ 86), one day after Munn wrote the Governor, it is not reasonable to infer that Munn made misrepresentations to the Governor or was trying to cover-up a scheme to discriminate against Bennie.

Munn's next alleged involvement was on March 10, 2010, when Herstein informed Munn that he had instructed Griess to take no regulatory action against Bennie and that he would keep the information learned in the investigation in a reserve file. (Am. Compl. ¶ 92). Bennie concludes that Munn was aware that the Department was keeping a "special file" on Bennie. The fact that Munn was aware that the Department was keeping a file relating to a regulatory investigation is hardly evidence that Munn was involved in a scheme to discriminate against Bennie for exercising his constitutional rights.

Bennie asserts that on November 2, 2010, LPL terminated its relationship with Bennie and that "upon information and belief" the termination was due to "continued pressure and harassment from Defendants related to Bennie, of which Munn was a part." (Bennie Brief at 35). Considering that Bennie does not allege any facts suggesting that Munn, or anyone else in the Department, had any contact with LPL for almost eight months before Bennie's termination, Plaintiff's allegation that LPL terminated Bennie because of the Department's "continued pressure and harassment," of which Munn "was a part," lacks the specificity necessary to establish Munn's personal involvement.

On December 17, 2010, Munn signed the Order approving Bennie's registration, with conditions. Munn signed the subsequent two orders as well. The Orders, which were public records, were posted on the Department's website. Because Munn is the Director of the Department, Bennie argues it is reasonable to infer that the Department's website "is under the control of Munn" and, therefore, Munn is responsible for posting the Orders. (Bennie Brief at 39). However, no facts are pled establishing that Munn was personally involved in the Orders being posted on the website.

Bennie argues that the Department did not conduct an on-site inspection of Bennie's files until March 9, 2011 and that it is a reasonable inference that this "delay" was "discussed with or approved by Munn." (Bennie Brief at 38). There are no facts supporting such an inference.

Bennie's allegations seek to impose liability on Munn simply because he was the Director of the Department.  While Munn was personally involved in the issuance of the Orders, there are no facts establishing his personal involvement in any of the other acts allegedly taken by the other Defendants.  All claims against Munn, except those relating to the Orders, should be dismissed.

### D.    Bennie's Claim Against Griess Relating to the Orders Fails to State a Section 1983 Claim.

Griess did not sign the December or February Orders.  Accordingly, Griess cannot be liable for any damages Bennie alleges flow from those Orders.  Bennie's claims against Griess that relate to the Orders fail to state a claim and should be dismissed.

### II.    BENNIE'S DUE PROCESS CLAIMS SHOULD BE DISMISSED BECAUSE THE DEPARTMENT FOLLOWED THE PROCESS ESTABLISHED BY STATUTE, BENNIE HAS NO PROPERTY RIGHT IN AN UNCONDITIONAL REGISTRATION, HAS NO CONSTITUTIONALLY PROTECTABLE LIBERTY INTEREST IN HIS REPUTATION, AND WAS NOT DENIED A LIBERTY INTEREST IN HIS RIGHT TO PURSUE AN OCCUPATION AND BENNIE FAILED TO REQUEST A HEARING.

### A.    The Department Followed the Process Provided in the Statute.

Bennie confuses Section 8-1103(4)(d) with Section 8-1103(9)(a).  When approving Bennie's registration, with conditions, the Department applied Section 8-1103(4)(d) which provides:  "The director may restrict or limit an applicant as to any function or activity in this state for which registration is required under the Securities Act of

13

Nebraska." Section 8-1103(4)(d) does not require a hearing before conditions are placed on a registration.

Bennie argues that he was denied due process because he was entitled to a formal hearing under Section 8-1103(9)(a). Section 8-1103(9)(a) applies only where the Department denies, suspends or revokes a registration. Id. Contrary to Bennie's repeated assertions, the Department did not deny, suspend or revoke Bennie's registration. Had the Department denied, suspended or revoked Bennie's registration he would not have been able to conduct *any* business, including providing advice to current clients, as a broker-dealer agent or an investment-adviser representative. Here, the Department *approved* Bennie's registration but placed conditions on his ability to solicit new clients. The Orders clearly allow Bennie to continue servicing his existing clients, and after February 17, 2011, accept new clients as long as he did not solicit their business. (Am. Compl. Ex. A & B). Once the Department completed its investigation, all conditions were removed from his registration.

### B.    Bennie Has No Property Interest In An Unconditional Registration.

The issue in this case is not whether Bennie was denied a property right in his registration (his registration was approved), but whether he has a property right in a registration without conditions. Bennie cites to no cases holding that a party has a property right in an unconditional registration or any other license. Because the Department has unfettered discretion under Neb. Rev. Stat. § 8-1103(4)(d) to place

conditions on a registration, the rule in <u>Entergy Arkansas, Inc. v. Nebraska</u>, 161 F. Supp. 2d 1001 (D. Neb. 2001) (Kopf, J.), applies and Bennie has no property right in obtaining an unconditional registration.

Bennie argues that he had a property interest in an unconditional registration because "The Securities Act substantially limits the Director's discretion…" to place conditions on a registration (Bennie Brief at 67). Neb. Rev. Stat. § 8-1103(4)(d) provides: "The director may restrict or limit an applicant as to any function or activity in this state for which registration is required under the Securities Act of Nebraska." Contrary to Bennie's argument, this section grants unfettered discretion to the Department to impose conditions on a registration. As discussed below, this is an important statute which provides the Department with flexibility when balancing the interests of the applicant with the Department's duty to protect the investing public.

Given LPL's serious allegations that it terminated Bennie for cause because he violated firm policies and procedures (Am.Compl. ¶ 97), the Department had a regulatory duty to protect the investing public. The Department had two options: (1) summarily postpone or suspend Bennie's registration under Neb. Rev. Stat. § 8-1103(9)(c)(ii) which would have prevented Bennie from working as an investment adviser representative and agent of a broker dealer pending a final determination of a formal proceeding, or (2) pursuant to Neb. Rev. Stat. § 8-1103(4)(d), approve Bennie's

registration with conditions which would allow Bennie to continue servicing his existing clients, until an investigation could be completed.

Ironically, Bennie argues that the Department should have taken a more severe regulatory posture towards him. That is, Bennie appears to argue the Department should have summarily postponed or suspended Bennie's registration under Section 8-1103(9)(c)(ii), preventing Bennie from working as an agent of a broker-dealer and investment adviser representative until the Department's investigation was complete and a formal determination was made under Section 8-1103(9)(a). As a practical matter, the time to complete the investigation, conduct a formal hearing, and issue a written decision would likely have imposed a much greater hardship on Bennie who would not be able to conduct *any* business as a broker-dealer agent or investment adviser representative pending the Department's decision. Bennie would have been required to report the suspension on his CRD which would have followed him throughout his career.

The Department took an approach which was much more beneficial to Bennie by approving his registration, but placing conditions on his ability to solicit new clients. This allowed Bennie to continue servicing his existing clients. After Bennie complained that the conditions were too strict, the Department issued an Amended Order in February, 2011 which allowed Bennie to accept new clients if they contacted him. (Am.

Compl. Ex. B).   However, he was still prevented from soliciting new clients.   All conditions were removed in the March Order. (Am. Compl. Ex. C).

Holding that Bennie has a property right in an unconditional registration would eviscerate the Department's discretion to place conditions on registrations, a power expressly provided by Section 8-1103(4)(d).   The result will be that agents of broker dealers and investment adviser representatives will face much more severe regulatory actions, i.e., summary postponement or suspension of their registrations, pending a final decision by the Department.   This would impose a much greater hardship on applicants than the regulatory action taken by the Department here.

### C.      Posting The Orders Did Not Change Bennie's Legal Status.

Bennie relies on Wisconsin v. Constantineau, 400 U.S. 433 (1971) for the proposition that when a person's reputation is at stake because of what the government is doing to him, notice and opportunity to be heard are required.   (Bennie Brief at 77). However, as the Eighth Circuit recognized in Paul v. Davis, 424 U.S. 693, 712, (1976), "the Supreme Court expressly narrowed and distinguished [Constantineau ]" Green v. DeCamp, 612 F.2d 368, 370 (8th Cir. 1980).

In Paul, the Court held that although a government posting which imputed that the plaintiff committed a crime may be defamation per se, the stigma to one's reputation was not a property or liberty interest protected by the fourteenth amendment.   The

court held that in order to be actionable, a stigma resulting from a government posting must result in a "change in legal status." Paul 424 U.S. at 708.

While Bennie argues that the act of posting of the Department's orders stigmatized him (Bennie Brief at 77-79), he does not allege facts showing that the act of posting the Orders, which are public records, on the Department's website changed his legal status. Bennie does not allege any member of the public read the orders or took any actions in reliance on them. The Orders had the effect of law regardless of whether they were posted on the Department's website or otherwise made available to the public. Bennie has not alleged facts establishing that the Department's posting of the Orders deprived him of a liberty interest.

**D.      Bennie Was Not Deprived of His Right to Pursue His Profession.**

In order to state a claim for a deprivation of a right to pursue one's profession, one must establish "a complete prohibition of the right to engage in a calling." Conn v. Gabbert, 526 U.S. 286, 291-92, (1999). Moreover, the right to pursue one's profession "is subject to reasonable government regulation." Id. The Eighth Circuit has held that whatever the right to pursue one's profession entails, "this asserted fundamental right clearly does not encompass a 'brief interruption' of work in a desired occupation." Flowers v. City of Minneapolis, Minn., 478 F.3d 869, 874 (8th Cir. 2007).

The Orders did not completely prohibit Bennie from pursuing his chosen profession. Bennie was registered throughout the period in question and was able to

continue servicing his existing clients.  Between December 17, 2010 and February 17, 2011, the Department prohibited Bennie from accepting new clients.  (Am. Compl. Ex. A & B).  Given LPL's allegations against Bennie, it was reasonable for the Department to limit Bennie's ability to solicit new clients in order to protect the investing public.  Because it would be too disruptive to suspend Bennie's registration, which would have required all of Bennies existing clients to transfer their accounts to a new adviser, the Department allowed Bennie to continue servicing those clients with whom he had already developed a relationship and who, presumably, trusted his advice.   On February 17, 2011, Bennie was able to accept new clients.  (Am. Compl. Ex. B).  Bennie alleges that he remains registered, and works as a securities broker-dealer agent and investment adviser representative which shows that he has not had a change in legal status as a result of the Orders being posted on the Department's website.  (Am. Compl. ¶ 6, Ex. C).  Based on these facts, the Orders did not completely prohibit Bennie from pursuing his profession.  Accordingly, he has failed to allege that he was deprived of a protectable liberty interest in his ability to pursue his profession.

### E.   Bennie's Procedural Due Process Claims Fail to State a Claim Because He Failed to Exhaust Available Administrative Remedies.

### 1.   Nebraska's Regulations and Statutes Allowed Bennie to Request a Hearing.

Bennie does not dispute that he never filed a request for a hearing with the Department.  Instead, Bennie argues that 49 N.A.C. § 5.003.02 did not provide him with

a right to a hearing and that this regulation cannot be used to review a decision of the Department in a contested case.  (Bennie Brief at 83).  First, when a petition for a declaratory order is filed, 49 N.A.C. § 5.005.01 authorizes the Department to designate a hearing officer who can schedule a date and time where the parties to the proceeding may have a hearing.  In fact, the Department has held hearings in response to a party filing a petition for a declaratory order.  See, e.g., Mortgage Elec. Registration Sys., Inc. v. Nebraska Dept. of Banking & Fin., 270 Neb. 529, 530, 704 N.W.2d 784, 785 (2005) (noting that plaintiff filed a petition for a declaratory order and the Department of Banking and Finance held a hearing on the petition at which evidence was received). Bennie's contention that his failure to file a petition for a declaratory order is of no consequence because that section would not allow for a hearing is incorrect.

Second, Bennie's argument that a petition for declaratory order cannot be used to review a decision in a contested case misses the point because the Department's orders were not issued as a result of a contested case.  Bennie could have used a petition for a declaratory order to request a hearing on whether the Orders were properly issued by the Department.  That proceeding would then *become* a contested case which would be reviewable pursuant to the Administrative Procedure Act ("APA").

Bennie also argues that he could not have requested a hearing under Neb. Rev. Stat. § 8-1119, because under Neb. Rev. Stat. § 84-917 an appeal under the APA may only take place where there is a contested case which requires a hearing.  (Bennie Brief

20

at 81).  Neb. Rev. Stat. § 8-1119 provides that "Any person aggrieved by a final order of the director may appeal the order, and the appeal shall be in accordance with the Administrative Procedure Act."  It is undisputed that the Orders were final orders of the director and Bennie did not appeal them.

By failing to request a hearing under 49 N.A.C. § 5.003.02 or Neb. Rev. Stat. § 8-1119, Bennie failed to exhaust his administrative remedies.

**2.      Bennie Failed to Request a Hearing Under Section 8-1108.01(5).**

Throughout his brief, Bennie contends that the Department's Orders constituted a "suspension" of his registration.[1]  (Bennie Brief at p. 18, 19, 20, 25, etc.).  Bennie cannot have his cake and eat it too.  If the Department's Orders were orders of suspension under Section 8-1103(9)(a), then Bennie was obligated to file a written request for a hearing within fifteen business days after each Order was entered.

Section 8-1103(9)(a), dealing with the Director's power to deny, suspend, or revoke a registration, incorporates the hearing procedures set forth in Section 8-1108.01. Section 8-1108.01 provides:

> …**if a request for a hearing is filed in writing within fifteen business days of the issuance of the order by the person to whom such order was directed, a hearing shall be held** by the director within thirty business days after receipt of the request, unless both parties consent to a later date or the hearing officer sets a later date for good cause.  **If no hearing is**

---

[1]  As discussed above, Defendants disagree with Bennie's characterization that the Orders were a "suspension" of his registration.  The orders approved his registration but placed conditions on his ability to solicit new clients.  The anti-solicitation condition was removed after the Department completed its investigation.

**requested within fifteen business days of the issuance of the order and none is ordered by the director, the order shall automatically become a final order** and shall remain in effect until it is modified or vacated by the director.

Neb. Rev. Stat. § 8-1108.01 (emphasis added).

Bennie does not allege that he filed a written request for a hearing within fifteen business days of the issuance of the Orders. If the Orders were orders of suspension, as Bennie contends in his brief, then he waived his procedural right to a hearing by failing to file a written request with the Department.

A party should not be allowed to complain that he or she was denied due process when there are procedures available to request a hearing but the party elects not to use them. Because there were "processes on the books" which provided Bennie due process, and Bennie failed to avail himself of any of those processes, he cannot now claim that he was denied due process. Claims I and IV which allege violations of due process should be dismissed.

### III.   BENNIE LACKS STANDING TO ASSERT CLAIMS ON BEHALF OF BBWM.

Bennie argues that BBWM should not be dismissed because BBWM allegedly suffered damages because of Defendants' alleged actions. (Bennie Brief at 84). He argues that the harm to Bennie individually and to BBWM is "inextricably intertwined." Id. However, BBWM is not named as a plaintiff in this action. Rather, Bennie is suing "on behalf of Bob Bennie Wealth Management, Inc." (Am. Compl., Caption).

Eighth Circuit case law is clear that a shareholder lacks standing to file a Section 1983 action on behalf of a corporation.[2]  See Potthoff v. Morin, 245 F.3d 710, 717 (8th Cir. 2001) ("We hold that the shareholder standing rule applies to civil rights actions brought pursuant to 42 U.S.C. § 1983 by shareholders claiming injury to their corporations.") (quoting Erlich v. Glasner, 418 F.2d 226, 227 (9th Cir. 1969) "[E]ven though a stockholder owns all, or practically all, of the stock in a corporation, such a fact of itself does not authorize him to sue as an individual...We find nothing in the Civil Rights Act which would permit [the plaintiff-stockholder] to circumvent the rule of law just stated, completely avoid the corporate entity and thus maintain an action in his own name.").

Bennie cites to no authority to support the proposition that he can assert claims for damages on behalf of a corporation.  Bennie does not dispute that a plaintiff may only assert his own injury and "cannot rest his claim to relief on the legal rights or interests of third parties." Warth v. Seldin, 422 U.S. 490, 498-99 (1975).  Bennie does not dispute that in order to state a claim under Section 1983, he must allege (1) that some person deprived BBWM of a federal right and (2) that the person who deprived BBWM of a federal right acted under color of state law.  See Gomez v. Toledo, 446 U.S. 635, 640, (1980).  Bennie does not dispute that his Amended Complaint lacks any allegation that

---

[2] Bennie does not even allege he is a shareholder of BBWM.  The only allegation in the Amended Complaint that mentions BBWM is in Paragraph 21 in which Bennie alleges he "operated his business as Bob Bennie Wealth Management, Inc."  (Am. Compl. ¶ 21).  This is insufficient to confer standing on Bennie or to allege that BBWM was harmed.

Defendants took any actions against BBWM, that BBWM was deprived of any of its rights, or that BBWM was damaged.  Bennie admits that the Securities Act of Nebraska does not require registration of BBWM.  (Bennie Brief at 84).  To the extent Bennie is asserting claims "on behalf of Bob Bennie Wealth Management, Inc." those claims must be dismissed, because Bennie lacks standing to assert them.

## CONCLUSION

For the foregoing reasons, Bennie's Amended Complaint should be dismissed.

JOHN MUNN, JACK E. HERSTEIN, RODNEY R. GRIESS, JACKIE WALTER, in their official and individual capacities, Defendants

BY: /s/ Timothy J. Thalken
Mark C. Laughlin, #19712
Timothy J. Thalken, #22173
FRASER STRYKER PC LLO
500 Energy Plaza
409 South 17th Street
Omaha, Nebraska  68102-2663
(402) 341-6000
mlaughlin@fraserstryker.com
tthalken@fraserstryker.com
ATTORNEYS FOR DEFENDANTS

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 31, 2011, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

> Steven Grasz
> David M. Newman
> HUSCH BLACKWELL LLP
> 1620 Dodge Street, Suite 2100
> Omaha, NE 68102
> ATTORNEYS FOR PLAINTIFF

/s/ Timothy J. Thalken

606956.03