IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| ROBERT R. BENNIE, JR., <br><br>                    Plaintiff, <br><br> vs. <br><br> JOHN MUNN, et al., <br><br>                    Defendants. | 4:11-CV-3089 <br><br> FINDINGS OF FACT AND <br> CONCLUSIONS OF LAW |

    This matter is before the Court after a bench trial on the plaintiff's claim for injunctive relief from the defendants' alleged violation of his First Amendment rights. For the reasons that follow, the Court finds that the plaintiff engaged in First Amendment-protected activity and that he may have been singled out by State officials at least in part because of the exercise of his First Amendment rights. But while that conduct was improper, the Court finds that the adverse actions taken by the defendants were not substantial enough to deter a person of ordinary firmness from continuing to exercise his First Amendment rights. So, while the Court disapproves of the defendants' conduct, the Court will dismiss the plaintiff's complaint.

SUMMARY OF FACTS

    The plaintiff, Robert Bennie, at all relevant times worked as a financial advisor, specializing in wealth management and retirement planning. Filing 192 at 30. He worked as a representative of Linsco Private Ledger (LPL), a brokerage firm, under the d/b/a name of "Bob Bennie Wealth Management." Filing 192 at 31, 42-43. LPL held the investors' assets and accounts, and its compliance department helped LPL representatives comply with financial regulations, particularly rules promulgated by the Financial Industry Regulatory Authority (FINRA). Filing 192 at 31. The compliance department, among other tasks, oversaw and approved representatives' advertising and marketing. Filing 192 at 32. The plaintiff was also politically active. He had become involved with the state Republican Party in the late 1990s, but became disenchanted with it, and began to support the Tea Party movement in 2009. Filing 192 at 12-25, 27-28.

    LPL, as a broker-dealer, is subject to regulation by the Nebraska Department of Banking and Finance. Filing 173 at 1. The four defendants are employees of the Department. Filing 173 at 2. Specifically, John Munn was

the director of the Department, Rodney Griess was the supervisor of the Department's Securities Investigation and Compliance Unit, Jackie Walter was a securities examiner,[1] and Jack Herstein was the assistant director of the Department in charge of the Bureau of Securities (making him Walter and Griess' direct supervisor). Filing 173 at 2.

In December 2009, the plaintiff was informed that state financial regulators had contacted LPL about a promotional software CD-ROM[2] that the plaintiff had distributed. Filing 192 at 37, 50. The plaintiff said he had distributed the last of the CD-ROMs years before, and that's why a subsequently-required disclosure was missing. Filing 192 at 40-41. Griess explained that as part of his duties for the Department, he was responsible for ensuring that advertising by investment advisors or registered representatives complied with FINRA regulations. Filing 192 at 114-15. He said the CD-ROM had been given to Walter by her husband, who had gotten it from a friend or acquaintance at a county fair. Filing 192 at 116-17. Griess received it in November 2009, and questioned whether it displayed all the proper disclosures. Filing 192 at 117-18. So, in mid-November, Griess contacted LPL about the CD-ROM, but LPL did not immediately reply. Filing 192 at 125-26.

The plaintiff also drew the attention of regulators for a television advertisement he ran in late 2009. Filing 192 at 45. In the advertisement, the plaintiff offered potential clients $100 toward the purchase of a firearm if they decided to do business with him. Filing 192 at 45. LPL had approved the advertisement, and it was consistent with FINRA rules permitting a promotional gift of up to $100. Filing 192 at 45-47. Griess spoke to Chris Zappala, the LPL vice-president in charge of marketing regulatory review, on December 30, 2009, and then wrote him a letter on the same date. Filing 173 at 2; E214. The letter included a copy of the advertisement, and asked whether LPL had approved it. E214. Griess said the advertisement was "unusual," and he "couldn't imagine" LPL had approved it. Filing 192 at 133-35.

A conference call was eventually set for February 4, 2010, to discuss the CD-ROM and television commercial. On February 1, an article appeared in the Lincoln Journal-Star newspaper under the headline, "Bennie acts as Lincoln's tea party voice." E220; *see also* Don Walton, *Bennie acts as Lincoln's tea party voice*, Lincoln-Journal-Star, February 1, 2010, http://journalstar.com/news/local/govt-and-politics/bennie-acts-as-lincoln-s-

---

[1] All claims against Walter were dismissed at trial at the plaintiff's request.

[2] The witnesses variably referred to this as a DVD or CD. It appears to the Court to be a CD-ROM. *See* E30.

tea-party-voice/article_242e3a4e-0ec2-11df-87b1-001cc4c03286.html. In the caption for the accompanying photograph of the plaintiff, he was identified as "Bob Bennie, owner of Bob Bennie Wealth Management." E220. And the plaintiff's business was described in the text of the article, with the statement: "Bob Bennie Wealth Management is a business that runs the financial table, from retirement planning and estate planning to investment management." E220. But the bulk of the article described the plaintiff's political activities and views: he was described as angry, and made several comments that were sharply critical of elected officials. E220. The plaintiff said that he hadn't discussed his business with the reporter, and didn't ask the reporter to include information about his business in the article. Filing 192 at 64.

Griess said he saw the newspaper article and found it to be "also quite unusual." Filing 192 at 139. He said at trial that the sentence referring to "Bob Bennie Wealth Management" stood out to him, because it meant that the article could be an "advertisement" for FINRA purposes. Filing 192 at 140. Griess forwarded a link to the article to Zappala. Filing 192 at 141. But the email Griess sent Zappala didn't ask about the reference to the plaintiff's business—instead, in addition to the link, Griess quoted several of the plaintiff's more inflammatory remarks about President Barack Obama. E218. The next day, Griess emailed Sheila Cahill, legal counsel at the Department, and wrote,

> I've scheduled a conference call with LPL concerning Bob Bennie and his recent string of activities; i.e., lack of IA disclosure, gun slingin ads, and calling Obama a "communist" and an "evil" man issues. Slated for 10am tomorrow in the Interview Room unless I hear otherwise from LPL. Would like to have you present if you can make it. Jack's coming too.

E19. But at trial, Griess denied that the plaintiff's political statements were really the "issue" he was referring to. Filing 192 at 147-49.

A conference call was held on February 4, 2010, that included Griess and Zappala. Filing 192 at 126-27. Griess was informed at that time that LPL had approved the CD-ROM and firearm-promotion commercial. Filing 192 at 138, 155. Another teleconference was arranged for February 8. Filing 192 at 157. Griess emailed Zappala, identifying for discussion whether LPL would

> anticipate imposing any kind of heightened supervision, more frequent/unannounced exam schedule, specialized advertisement approval process or other sanction(s) that may provide the

- 3 -

> Department with a little better sense that the firm is "on top of" addressing this type of activity which in turn may be of some comfort to us and really is in the best interest of the public, would be nice to know also.

E231. During the February 8 call, someone from the Department also asked Zappala whether LPL had "any guidelines on communicating political views to the public." Filing 193 at 15, 78-79, 82-83; *see* E237. Zappala replied via email, to Griess, that it did not. E237.

The next solicitation that came to the attention of state regulators was an invitation mailed out inviting recipients to a one-on-one dinner meeting with the plaintiff to discuss their financial plans. E239. Because it was an advertisement, it was subject to FINRA regulations, and had been approved by LPL before it was sent out. Filing 192 at 67-68. The mailing list for the invitations was generated by the vendor—an insurance company—and one was sent to Munn. Filing 192 at 68. Griess called the plaintiff asking questions about the wording of the invitation. Filing 192 at 73. The plaintiff referred him to LPL. Filing 192 at 74. Griess sent a sharply-worded email to Zappala on February 18, 2010 regarding the solicitation, referencing an understanding that the plaintiff "was to be assigned a 'Senior Analyst' to review/approve communications prior to their release." E238. The email expressed the Department's concern "not only with the persistent, multiple, repeated acts of non-compliance, but with the continued failure of LPL to act in an appropriate manner to remedy the issues." E238. The email demanded that LPL provide, on or before February 26, 2010, the name and contact information of the senior analyst assigned to the plaintiff. E238. Griess testified that the email was sent on the instruction of Herstein. Filing 192 at 183. LPL replied, disagreeing with the claim that the solicitation was noncompliant. Filing 192 at 188.

The Department also contacted LPL about an advertisement the plaintiff sent out for a Sun Life Financial product, again questioning whether the advertisement contained the required disclosures. Filing 192 at 80; E248. The advertisement had been prepared by Sun Life and pre-approved by LPL, but LPL reported that it had believed the advertisement was to be sent out under the plaintiff's letterhead. Filing 192 at 81. In fact, the advertisements had been sent out directly by Sun Life, so the plaintiff's letterhead had not been an option. Filing 192 at 81-82. As a result, certain required disclosures were missing that LPL told the plaintiff should have been included. Filing 192 at 81.

Sometime shortly after February 4, 2010, the plaintiff had been told by LPL that he was going to be reassigned to a new, higher-level analyst for

- 4 -

advertising compliance. Filing 192 at 75-76. The plaintiff received an email from LPL dated February 26 explaining a "new organizational structure" for the "Marketing Regulatory Review" team. E253. The changes had apparently gone "live" on January 25, and the message appears to have been sent as a mass email to all of LPL's financial advisors. E253; *see* filing 194 at 79. But the plaintiff testified, over objection,[3] that he understood the reassignment to have occurred because of pressure from State regulators to put the plaintiff under heightened supervision. Filing 192 at 77-78. The plaintiff claimed that if there was some sort of reorganization that caused the reassignment, that had not been communicated to him. Filing 192 at 78-79.

The plaintiff testified that it bothered him when he learned about the Department's contact with LPL about the newspaper article, because, he said, "it isn't their job." Filing 192 at 61. From his perspective, it seemed like he wasn't really "on the Nebraska Department of Banking's radar" before the newspaper article, but that afterward, calls from the Department "seemed like they were weekly." Filing 192 at 85. And he had been reassigned to a different compliance supervisor, which he said he believed was the result of departmental pressure. Filing 192 at 85. So, toward the end of February 2010, he called Governor Dave Heineman, explained what he believed was happening, and asked the Governor to "get [the Department] off [his] back." Filing 192 at 85-86. And, the plaintiff said, communication from the Department "died down" after that. Filing 192 at 89. No sanctions were imposed by the Department for any of the plaintiff's acts. Filing 194 at 55. LPL, however, did perform an unannounced audit at the plaintiff's office in July 2010. Filing 193 at 89.

In the meantime, the plaintiff continued his political activism. Filing 192 at 99. Two more Tea Party rallies were held in April and September, 2010, and the plaintiff spoke at both of them. Filing 192 at 99. On November 2, 2010, LPL terminated its relationship with the plaintiff. Filing 192 at 90. LPL eventually filed a form with the Department providing a reason for the termination, explaining that the plaintiff had violated firm policies regarding the use of white-out on customer account forms.[4] Filing 192 at 94. The

---

[3] The Court overruled the objection, which was based on foundation and hearsay, at trial. To make sure the record is clear: the Court has considered the testimony, and other similar testimony, as evidence of the plaintiff's state of mind, which is relevant to the "chilling effect" that the defendants' actions may or may not have had on his political activity. Otherwise, the Court has not afforded such evidence significant weight.

[4] The defendants objected to this testimony as irrelevant because it described events that took place after March 10, 2010, and it is stipulated that none of the Department's actions after that date form a basis for any First Amendment violations. Filing 192 at 96. That objection is without merit: the testimony is relevant to the extent that the plaintiff's

- 5 -

plaintiff denied using white-out after LPL implemented rules against it. Filing 192 at 96. The plaintiff testified at trial that he was "not sure" why his relationship with LPL ended, but that he thought "it had something to do with the pressure that the State was putting on – on LPL." Filing 192 at 90. He also said, however, that he had "kind of two theories of why it happened" and "probably it was a combination of two things."[5] Filing 192 at 92.

After his termination by LPL, the plaintiff said, he hadn't done "any kind of Tea Party type or political activity since then." Filing 192 at 99. He testified that was because of what appeared, to him, to be a connection between his political speech and what happened to his business. Filing 192 at 100. He had been interviewed on television in November 2013 but said he had tried to be "restrained" in his comments. Filing 192 at 108. The plaintiff said that, after he later saw the Department's emails discussing his political speech, he felt he might be a target for State regulators. Filing 192 at 107. This suit followed.

## DISCUSSION

Before setting forth the basic propositions of law that control the Court's disposition of this case, it will be helpful to clearly define the question that has been presented to the Court. The issue is whether the defendants, in their official capacities, violated the plaintiff's First Amendment rights by retaliating against him for political speech. The plaintiff is only seeking declaratory and prospective injunctive relief against the defendants in their official capacities, so qualified immunity is not at issue. Filing 192 at 11. The plaintiff is claiming no First Amendment violation based on any acts of the defendants after March 10, 2010. Filing 192 at 3. And as a practical matter, the February 1 newspaper article is the flashpoint for the plaintiff's theory of the case. So the Court is focused on whether the defendants, between February 1 and March 10, violated the plaintiff's First Amendment rights.[6]

---

termination, although it took place in November, might have been caused by the Department's acts before March 10.

[5] The other theory, for the sake of completeness, related to a lawsuit filed against the plaintiff and a public stock offering from LPL—the plaintiff apparently believed that LPL wanted to get rid of him so that the lawsuit wouldn't cause trouble for the IPO. Filing 193 at 38-39. That evidence was objected to by the plaintiff, and the Court finds that it is relevant only to the limited extent that it reflects on the plaintiff's state of mind. In the end, it doesn't matter why the plaintiff was terminated by LPL, it only matters why he *wasn't*— that is to say, whether there is evidence connecting the termination to the Department.

[6] The Court notes the defendants' argument that Herstein and Munn, considered separately, are not subject to supervisory liability—that is to say, that even if Griess was in the wrong, Herstein and Munn didn't know about it. *See* filing 197 at 31-32. There are some

The law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for speaking out. *Peterson v. Kopp*, 754 F.3d 594, 602 (8th Cir. 2014) (citing *Hartman v. Moore*, 547 U.S. 250, 256 (2006)); *Bernini v. City of St. Paul*, 665 F.3d 997, 1006-07 (8th Cir. 2012); *see Small v. McCrystal*, 708 F.3d 997, 1008 (8th Cir. 2013). To establish a First Amendment retaliation claim under 42 U.S.C. § 1983, the plaintiff must show (1) he engaged in a protected activity, (2) the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity. *Peterson*, 754 F.3d at 602; *Scheffler v. Molin*, 743 F.3d 619, 621 (8th Cir. 2014); *Spencer v Jackson Cty.*, 738 F.3d 907, 911 (8th Cir. 2013); *Santiago v. Blair*, 707 F.3d 984, 991 (8th Cir. 2013); *Small*, 708 F.3d at 1008; *Beaulieu v. Ludeman*, 690 F.3d 1017, 1025 (8th Cir. 2012); *L.L. Nelson Enters., Inc. v. Cty. of St. Louis*, 673 F.3d 799, 807-08 (8th Cir. 2012); *Bernini*, 665 F.3d at 1007; *Zutz v. Nelson*, 601 F.3d 842, 848-49 (8th Cir. 2010); *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004); *see Baribeau v. City of Minneapolis*, 596 F.3d 465, 481 (8th Cir. 2010).

It is not disputed that the plaintiff engaged in protected political speech. So, the Court must determine whether that political speech motivated retaliatory action by the defendants and, if so, whether that action would chill a person of ordinary firmness from continuing his political activity. These are factual findings for the Court: the causal connection between the adverse action and the protected speech is a question of fact, and whether an alleged retaliatory act was sufficient to deter a person of ordinary firmness from exercising his constitutional rights is also ultimately a question of fact. *See, Bistrian v. Levi*, 696 F.3d 352, 376 (3d Cir. 2012); *Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 583-84 (6th Cir. 2012); *Beaulieu*, 690 F.3d at 1025; *Revels*, 382 F.3d at 876; *Naucke v. City of Park Hills*, 284 F.3d 923, 928 (8th Cir. 2002); *see also, Santiago*, 707 F.3d at 992; *Garcia v. City of Trenton*, 348 F.3d 726, 729 (8th Cir. 2013).

To prove retaliation, the plaintiff must show that the retaliatory motive was a "substantial factor" or "but-for cause" of the adverse action. *Peterson*, 754 F.3d at 602; *Baribeau*, 596 F.3d at 481; *see Small*, 708 F.3d at 1008. In other words, the plaintiff must show he was singled out because of his exercise of constitutional rights. *Peterson*, 754 F.3d at 602; *Bernini*, 665 F.3d at 1007; *Baribeau*, 596 F.3d at 481; *see Beaulieu*, 690 F.3d at 1025. The

---

factual problems with that—for instance, Herstein participated in the February 8 conference call at which LPL was asked about its policies, if any, about political speech. But more to the point, for purposes of prospective relief, there is no distinction among the defendants to speak of.

- 7 -

retaliatory conduct itself need not be a constitutional violation: the violation is acting in retaliation for the exercise of a constitutionally-protected right. *Spencer*, 738 F.3d at 911.

The defendants argue that the plaintiff was not singled out because, according to the defendants, their regulatory review of the plaintiff's activities was routine. Filing 197 at 30. They contend that Griess simply made "legitimate inquiries" regarding the plaintiff's advertising activities. Filing 197 at 31. The problem with that argument is that the defendants—particularly Griess—*also* made quite specific inquiries about the February 1, 2010 newspaper article that were *not* related to any supposed advertising activity. It is apparent, from Griess' emails and the follow-up inquiries of LPL, that the Department had an interest in the plaintiff's statements of political opinion. Griess' testimony to the contrary is simply not credible, nor is the testimony of his codefendants attempting to rationalize that inquiry. Not to put too fine a point on it, but it is apparent to the Court that the defendants—particularly Griess, and to some extent Herstein—were bothered by the plaintiff, in no small part because of the plaintiff's political views, or at least the manner in which he expressed those views. And that antipathy was manifested in the Department's regulatory attention to the plaintiff.

That said, it is also clear that some of the Department's questions to LPL were generated before the newspaper article was published. There is some suggestion that the defendants were aware of the plaintiff before then, and that they may have found the demeanor and tone of his marketing distasteful—but there is nothing to connect any of that to protected political speech. So, there is some force to the defendants' claims that at least some of the defendants' investigation would have taken place regardless of the plaintiff's political activity. But it is hard to say how much, given the circumstances, and it is even harder to conclude that the Department's missives to LPL would have been as consistent and forceful had they not been politically motivated.

Simply put, after the February 1, 2010 newspaper article was published, the defendants—again, particularly Griess—took an interest in the plaintiff's political speech. And they made regulatory inquiries of LPL that were motivated, to varying degrees, by the content of the plaintiff's speech. It would be fair to conclude, from the evidence, that after February 1, the defendants were looking for reasons to go after the plaintiff. Some of the questions they asked of LPL would not have been asked had it not been for the plaintiff's political activity. The Department had no business asking those questions; to do so was certainly wrong, and was arguably unconstitutional.

But the Court need not conclusively resolve that argument, because the Court finds that even if there was a constitutional violation, it was *de minimis*—insufficiently substantial to support a claim for relief. The standard for making that determination, as noted above, is whether the government's action against the plaintiff would chill a person of ordinary firmness from continuing in his constitutionally-protected activity. The ordinary-firmness test is well established in the case law, and is designed to weed out trivial matters from those deserving the time of the courts as real and substantial violations of the First Amendment. *Santiago,* 707 F.3d at 992; *Garcia v. City of Trenton,* 348 F.3d 726, 729 (8th Cir. 2003); *see, Williams v. City of Carl Junction,* 480 F.3d 871, 878 (8th Cir. 2007); *Naucke,* 284 F.3d at 928. And the fact of the matter is that the plaintiff's political speech was *not* chilled by anything the defendants did. If anything, they riled him up. He continued his political activity unabated until he was terminated by LPL.

The Court is aware that the ordinary-firmness test is objective: the question is not whether the plaintiff himself was deterred. *Scheffler,* 743 F.3d at 621; *Garcia,* 348 F.3d at 729; *see Santiago,* 707 F.3d at 992. It would be unjust to allow a defendant to escape liability for a First Amendment violation just because an unusually determined plaintiff persists in his protected activity. *Bennett v. Hendrix,* 423 F.3d 1247, 1252 (11th Cir. 2005); *Keenan v. Tejeda,* 290 F.3d 252, 259 (5th Cir. 2002); *Smith v. Plati,* 258 F.3d 1167, 1177 (10th Cir. 2001); *Mendocino Envtl. Ctr. v. Mendocino Cty.,* 192 F.3d 1283, 1300 (9th Cir. 1999).

But how a plaintiff acted may be evidence of what a reasonable person would have done. *Scheffler,* 743 F.3d at 621; *Garcia,* 348 F.3d at 729; *see Santiago,* 707 F.3d at 992. And as of March 2010, the Department had inquired of LPL about a few regulatory matters, but ultimately done nothing about them. The plaintiff had been assigned to a new compliance analyst, but the evidence persuades the Court that the reassignment was decided upon before—and was unrelated to—anything the Department did. The plaintiff's subjective belief to the contrary is unsupported by the evidence. The Court finds that the Department's questions to LPL in February and March 2010 were not sufficient, standing alone, to chill a person of ordinary firmness from continuing his political activity—just as they did not chill the plaintiff.

The record is clear that the plaintiff's political activity was not actually chilled until his termination in November 2010. And such a termination, the Court finds, would chill a person of ordinary firmness—if it could reasonably be associated with the defendants' alleged retaliation. In other words, had the Department somehow been responsible for the plaintiff's firing, this might be a different case.

But the evidence simply does not prove that the Department got the plaintiff fired. It would make little sense for LPL, having been contacted by the Department in February 2010, to terminate the plaintiff the following November because of those contacts, despite having been left alone by the Department in the meantime. As the plaintiff himself explained, LPL could have terminated him on 30 days' notice at any time. Filing 193 at 216. The plaintiff does not have to believe LPL's justification for his termination, but that does not mean that by default, the Department is somehow responsible. The plaintiff's subjective belief that his termination was the Department's fault is not enough to prove that *objectively*, what the Department *actually* did would chill the speech of a person of ordinary firmness.

The Court is reminded of the scene from "The Godfather," in which Don Corleone explains to an assemblage of other mob bosses that he is concerned for the safety of his son Michael, and that he is "a superstitious man," and that "if some unlucky accident should befall him, if he should get shot in the head by a police officer, or if he should hang himself in his jail cell, or if he's struck by a bolt of lightning," then the Don would hold his rivals responsible. By the time he was terminated in November 2010, the plaintiff had become a superstitious man. And perhaps he had a right to be. But that does not mean that the defendants can be held responsible for everything bad that happened to the plaintiff, unless there is evidence that they caused it to happen. There is not nearly enough evidence here to prove that.

The Court finds that the adverse actions taken by the defendants would not chill a person of ordinary firmness from continuing constitutionally-protected conduct. The Court will, therefore, dismiss the plaintiff's complaint. To make sure the record is clear: to the extent not already addressed, the Court will sustain the plaintiff's remaining evidentiary objections and overrule the defendants' remaining evidentiary objections. The Court's conclusion is the same, even considering the plaintiff's controverted evidence and disregarding the defendants'.

IT IS ORDERED:

1. The plaintiff's complaint is dismissed.

2. A separate judgment will be entered.

Dated this 30th day of September, 2014.

BY THE COURT:

John M. Gerrard
United States District Judge

- 11 -